DENVER & RIO GRANDE WESTERN RAILROAD
CO. ET AL. *v.* UNITED STATES ET AL.

No. 305.   Argued March 16, 1967.—Decided June 5, 1967.

*William H. Dempsey, Jr.*, argued the cause for appellants. With him on the briefs were *Jeremiah C. Waterman, Royce D. Sickler, C. W. Fiddes, David Axelrod, Eugene T. Lüpfert, Benjamin W. Boley, Martin J. Flynn, Giles Morrow, Peter T. Beardsley, Harry Jordan* and *R. Edwin Brady.*

*Robert S. Rifkind* argued the cause for the United States et al. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Howard E. Shapiro, Robert W. Ginnane* and *Betty Jo Christian. Thomas D. Barr* argued the cause for appellees Railway Express Agency, Inc., et al. *Mr. Barr* filed a brief for Railway Express Agency, Inc. *Owen Jameson* filed a brief for appellee Greyhound Corp.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question in this case is whether the Interstate Commerce Commission complied with its statutory responsibilities under § 20a of the Interstate Commerce Act [1] when it approved without consideration of control or anticompetitive consequences the issuance to appellee Greyhound Corporation of 500,000 shares of the common stock of appellee Railway Express Agency, Inc. (REA).

REA provides railroad express service and is also a motor common carrier. The approximately 2,000,000 shares of REA common stock outstanding are entirely owned by railroads and no railroad stockholder may dispose of its shares without first offering them to the other railroad stockholders. REA also is authorized, however, to issue 500,000 additional shares of common stock without first offering them to its stockholders. Greyhound, which operates an express carrier service through its wholly owned subsidiary Greyhound Lines, Inc., a motor carrier of passengers and express subject to the Interstate

[1] Section 20a of the Interstate Commerce Act, as amended, 41 Stat. 494, 49 U. S. C. § 20a, provides in pertinent part:

"(2) It shall be unlawful for any carrier to issue any share of capital stock . . . even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, . . . the Commission by order authorizes such issue . . . . The Commission shall make such order only if it finds that such issue . . . (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

Common carriers by motor vehicle are made subject to the provisions of § 20a (2) by § 214 of the Act, as amended, 49 Stat. 557, 49 U. S. C. § 314.

Commerce Act, agreed to purchase these 500,000 shares. REA thereupon applied to the ICC for an order under § 20a approving the transaction. Minority railroad REA stockholders, motor bus competitors of Greyhound, motor carriers, and freight forwarders intervened in the proceeding to protest against approval of the transaction. They alleged, among other things, the necessity of a hearing on the questions whether Greyhound's acquisition of the stock was in the "public interest" and for a "lawful object" as those terms are used in § 20a. The ICC approved the acquisition without a hearing. A three-judge District Court for the District of Colorado sustained the ICC order. 255 F. Supp. 704. We noted probable jurisdiction. 385 U. S. 897. We reverse with direction to the District Court to enter a new judgment remanding the case to the ICC for further proceedings consistent with this opinion.

I.

REA was organized in 1929 and until 1961 operated on a nonprofit basis under a pooling agreement with the railroads. See *Securities and Acquisition of Control of Railway Express Agency, Inc.,* 150 I. C. C. 423. Financial difficulties forced abandonment of the nonprofit operation and REA was converted to a profit and loss basis in order to effect more efficient and economic operation. See *Express Contract, 1959,* 308 I. C. C. 545, 549–550. In addition, REA was released from restrictions against use of carriers other than railroads. In 1963 REA's by-laws were amended to eliminate a limitation against stock ownership except by railroads; the disposition of shares by a railroad, however, was made subject to the right of first refusal of the other railroad stockholders. The issuance of 500,000 additional shares not subject to the right of first refusal was also authorized, but only upon the consent of two-thirds of the railroad stockholders.

Greyhound, principally a passenger carrier, became interested in expanding its growing express business. In January 1964 Greyhound offered to purchase, subject to ICC approval, at least 67% of REA's stock, of which Greyhound intended to offer 16% to major airlines. Greyhound also agreed to finance part of REA's capital requirements as part of a plan to coordinate the express services of both companies. This proposal was defeated by railroad stockholders.

REA and Greyhound persisted in their efforts to coordinate their operations. Greyhound proposed to acquire a 20% interest in REA through acquisition of REA's 500,000 authorized but unissued shares, stating that its "interest in REA . . . stems primarily from our views as to the improvements . . . which could be realized through combination and correlation of certain of our facilities and services." Greyhound offered to pay $16 per share if permitted to name one-fifth of the REA Board of Directors and if the REA Board would declare its intention "to consider seriously and work toward a long-term agreement between REA and Greyhound to consolidate operating functions and facilities . . . ," and if, further, the REA Board would agree "to consider seriously at a later time . . ." the sale of REA stock to airlines and the general public. Finally, Greyhound offered, if permitted to acquire the 500,000 shares, to purchase enough additional shares at $25 each to give it 50% of the stock of REA, the offer to remain open for 60 days following Greyhound's acquisition of the 500,000 shares. It expressed willingness, however, to purchase the 500,000 shares and leave "to the future the question of the acquisition of additional shares by Greyhound and giving the railroads an opportunity to reconcile their views on this question."

REA countered with an offer to sell the 500,000 shares at $20 per share provided Greyhound would agree to

offer within the 60-day period to purchase an additional 1,000,000 shares of the outstanding stock at the same price. The agreement was consummated on this basis subject to ICC approval.

REA's application to the ICC sought approval only of the issuance to Greyhound of the 500,000 shares. The application was supplemented with detailed data reviewing the negotiations, a statement of REA's financial condition and a statement of the purposes to which the $10,000,000 realized from the sale of the 500,000 shares would be applied. The burden of the protests of numerous intervenors was that the transaction was not in the "public interest" and for a "lawful object," but rather was the first step toward establishing a virtual monopoly of express transportation, and would result in "control" by Greyhound of REA, necessitating a hearing under § 5 of the Act.[2] The Department of Justice also intervened. It urged the ICC to conduct a hearing to determine whether the transaction would violate § 7 of the Clayton Act,[3] suggesting that, while a § 5 proceeding might be

---

[2] Section 5 (2) (a) (i) of the Act, as amended, 41 Stat. 480, 482, 49 U. S. C. § 5 (2) (a) (i), authorizes any carrier, with the approval and authorization of the Commission, "to acquire control of another through ownership of its stock or otherwise . . . ." Upon application of a carrier seeking such authority, the Commission "shall afford reasonable opportunity for interested parties to be heard," and if "the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) . . . and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . . ." § 5 (2) (b).

[3] Section 7 of the Clayton Act, as amended, 38 Stat. 731, 15 U. S. C. § 18, provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corpo-

unnecessary, one might be instituted and consolidated with the recommended Clayton Act § 7 proceeding, since the anticompetitive issues involved would be virtually identical.

Division Three of the ICC approved the application without hearing, ruling that investigation into the "control" and "anticompetitive" issues "would not be appropriate at this time . . . ." After the ICC denial of petitions for reconsideration this action to enjoin and set aside the ICC order was filed. The full Commission meanwhile reconsidered and affirmed the action of Division Three but postponed the effective date of the order pending the conclusion of judicial proceedings.

In the District Court the parties adhered basically to the positions maintained before the ICC, except that the Department of Justice abandoned its position urging a hearing on the § 7 question and declined either to support or to oppose the ICC order. In sustaining the order the District Court reasoned that, while the ICC might be required in some circumstances to consider "control" and "anticompetitive" issues before approving a stock issuance under § 20a, the ICC properly exercised discretion to defer consideration of such questions in this case until after it was determined whether and to what extent Greyhound would succeed in purchasing additional shares from railroad stockholders; only then would the "chain of events started by the stock issuance . . . [be] ascertainable rather than conjectural." 255 F. Supp. 704, 709.

In this Court the Government concedes, and the other appellees assume *arguendo,* that important issues of "control" and "anticompetitive" effects were involved in the application before the ICC. The Government has completely reversed its position from what it was before

ration engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

the ICC, arguing here that § 20a was designed to accomplish only the limited objective of protecting stockholders and the public from fiscal manipulation, and that, in any event, postponement of consideration of "control" and "anticompetitive" issues was justified in this case because the facts relevant to both issues might be wholly different at the end of the 60-day period, and because no prejudice to any party's interests could result from the delay.

## II.

We do not agree that Congress limited ICC consideration under § 20a to an inquiry into fiscal manipulation.[4] Even if Congress' primary concern was to prevent such manipulation, the broad terms "public interest" and "lawful object" negate the existence of a mandate to the ICC to close its eyes to facts indicating that the transaction may exceed limitations imposed by other relevant laws. Common sense and sound administrative policy point to the conclusion that such broad statutory standards require at least some degree of consideration of control and anticompetitive consequences when suggested by the circumstances surrounding a particular transaction. Both the ICC and this Court have read terms such as "public interest" broadly, to require consideration of all important consequences including anticompetitive effects. Thus the ICC is required to weigh anticompetitive effects in approving applications for merger or control under § 5 of the Act, authorizing the ICC to grant such applica-

---

[4] Section 20a was originally § 437 (1) of H. R. 10453, 66th Cong., which was almost identical to earlier legislation passed by the House in 1910 and 1914. See 58 Cong. Rec. 8317–8318 (1919). The 1910 version led to a study which condemned as a "public evil" intercorporate holdings of railroad stock. Report of the Railroad Securities Commission, H. R. Doc. No. 256, 62d Cong., 2d Sess., 21 (1911). These findings were part of the background against which Congress eventually passed § 20a, along with the Federal Trade Commission and Clayton Acts.

tions only if "consistent with the public interest." *Mc-Lean Trucking Co.* v. *United States,* 321 U. S. 67. And similarly broad responsibilities are encompassed within like broad directives addressed to other agencies. *E. g., National Broadcasting Co.* v. *United States,* 319 U. S. 190, 224; *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86, 94; *California* v. *FPC,* 369 U. S. 482, 484–485.

It is true that the requirement that the ICC consider anticompetitive effects is more readily found under § 5, since § 5 (11) enables the ICC to confer immunity from the antitrust laws for transactions approved under § 5 (2).[5] But the foundations of the ICC's obligation under § 5 are largely applicable to § 20a as well. Section 20a, like § 5, must after all be read in the context of overall ICC responsibilities. The responsibility under § 11 of the Clayton Act[6] to enforce that Act's provisions is one of them. The responsibility to advance the National Transportation Policy, read into the "public interest" standard of § 5, is another persistent and overriding duty, equally applicable to § 20a. In sum, as we said in *McLean Trucking, supra,* while transportation "legislation constitutes the immediate frame of reference within

---

[5] Section 5 (11), 49 U. S. C. § 5 (11), provides that "any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized . . . shall be and they are relieved from the operation of the antitrust laws . . . ."

[6] Section 11 of the Clayton Act, 15 U. S. C. § 21, provides in pertinent part: "(a) Authority to enforce compliance with . . . [§ 7] by the persons respectively subject thereto is vested in the Interstate Commerce Commission where applicable to common carriers subject to the Interstate Commerce Act, as amended . . . . (b) Whenever the Commission . . . shall have reason to believe that any person is violating . . . [§ 7] it shall issue . . . a complaint . . . containing a notice of a hearing . . . . The person so complained of shall have the right to . . . show cause why an order should not be entered by the Commission . . . requiring such person to cease and desist from the violation . . . ."

which the Commission operates . . . and the policies expressed in it must be the basic determinants of its action . . . , in executing those policies the Commission may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more, ignore the latter." 321 U. S., at 80.

In proceedings under § 20a (2), the ICC itself has not acted as though it lacks the power or responsibility to weigh anticompetitive consequences. In *Columbia Terminals Co.—Issuance of Notes,* 40 M. C. C. 288, 293, an application to issue notes under § 20a (2) was granted in part only on the condition that the notes be made the subject of competitive bidding. The ICC explicitly rejected the argument that § 10 of the Clayton Act, 15 U. S. C. § 20, requiring competitive bidding in certain situations, was superseded by § 20a. In *Stock of New Jersey, I. & I. R. Co.,* 94 I. C. C. 727, 729, the Commission said, in considering an application to issue stock: "[I]t can not be said that in the performance of the broad duty imposed upon us by the statute we must confine our investigation and consideration to the effect of proposed issues upon the carrier immediately involved. In any application to us for authority to issue securities we are bound to measure the proposal by the test of public interest in whatever phase that interest may appear to be affected."

This "broad duty" was significantly adhered to in *Chesapeake & O. R. Co. Purchase,* 271 I. C. C. 5. There, the C & O sought modification of an earlier order so as to enable it to acquire and exercise 400,000 shares of New York Central, and two of C & O's directors sought authority under § 20a (12) to hold seats simultaneously on the Central Board. C & O and its directors alleged, in terms strikingly similar to the claims in this case, that Central

needed funds and new management, and that the two companies were contemplating plans of mutual advantage and ultimately a merger under § 5 (2). The ICC took a broad view of its power and responsibility. It found, as to the § 20a (12) issue, that an insufficient showing had been made that "neither public nor private interests . . ." would be adversely affected by the proposed interlocking directorate, citing its own cases to the effect that authority would be granted under § 20a (12) only where no lessening of competition or independence occurred, 271 I. C. C., at 18, and pointing out that, even if the Central were strengthened, an interlocking directorate might injure other railroads in which the "public has just as great an interest . . . ," 271 I. C. C., at 40. In treating the request that it approve the stock acquisition, the ICC referred in great detail to the facts that (1) the acquisition, when considered along with long-range plans, would result in C & O control of Central; (2) extensive competition between C & O and Central would be eliminated; and (3) cooperation between C & O and Central would pose a substantial threat to another railroad, 271 I. C. C., at 24–29. It refused to authorize the acquisition, concluding that it was in effect being asked "to sanction a violation of the provisions of section 5 (4) [requiring carriers to request authority under § 5 (2) before acquiring control of another carrier] and also a violation of section 7 of the Clayton Antitrust Act." 271 I. C. C., at 39, 43. It stated that, if the applicants were so confident that their long-run aims would be in the public interest, they should seek authority for control under § 5 (2). These principles and arguments relied upon by the ICC in rejecting C & O's application are equally applicable here. The economic consequences do not differ because we are concerned here with the issuance of stock rather than an acquisition on the open market.

Appellees argue, with some ambivalence, that it would be anomalous to require the ICC to consider anticompetitive issues under § 20a (2). The ICC is authorized under § 5 to grant antitrust immunity for consolidations. No such power exists under § 20a,[7] and the Government contends therefore that to require consideration of § 7 issues under § 20a would lead to the "anomalous conclusion that a securities issue may have to be disallowed even though it might be the first step in an acquisition of control that the Commission could, on proper findings, authorize under section 5 notwithstanding antitrust considerations." REA advances a variant of this argument pointing out that the Sixty-sixth Congress, which passed both § 5 and § 20a, would not have "adopted the erratic policy of relaxing enforcement of the antitrust laws when competition was eliminated but requiring strict enforcement when lesser competitive harm might occur."

First, it is by no means true that greater competitive harm necessarily results from consolidations than from stock issuances under § 20a. A particular consolidation may be in the public interest because it increases competition in some respects, while a stock issuance, even though not involving control, may have no similar redeeming feature. Second, any anomaly which may be created by the juxtaposition of §§ 5 and 20a stems, not

---

[7] In *Pan American World Airways* v. *United States,* 371 U. S. 296, we held that Congress had entrusted the narrow questions there presented to the CAB; but the violations alleged were of the Sherman Act, which unlike the Clayton Act, 15 U. S. C. § 21, *supra,* n. 6, contains no provision imposing an affirmative duty upon the agency to enforce the Act's provisions. The industry there was one "regulated under a regime designed to change the prior competitive system," *id.,* at 301, and the CAB could have retained power and granted antitrust immunity for the actions involved had they occurred after passage of § 411 of the Civil Aeronautics Act of 1938, 52 Stat. 1003, *id.,* at 312.

from the fact that no immunity may be granted under § 20a, but from the ICC's special power under § 5. The obligation to enforce the Clayton Act is the rule, and § 5 is the exception. Finally, there are good reasons upon which Congress may have relied in providing that immunity might be conferred under § 5 but not under § 20a. Congress recognized in the Transportation Act of 1940, 54 Stat. 898, as it had in the Act of 1920, that railroad consolidations often result in benefits for the national transportation system as well as for the railroads involved. Consequently, it authorized the ICC to approve consolidations and to immunize them from the antitrust laws when they were found to be in the public interest. The special benefits sometimes realized from carrier consolidations are less likely to come about through the mere issuance of stock, unless the issuance results in control or merger; and when control or merger does result, the party acquiring control may invoke the Commission's power under § 5 to immunize the consolidation from the antitrust laws.

Appellees' reliance upon *Alleghany Corp.* v. *Breswick & Co.*, 353 U. S. 151, 355 U. S. 415, is misplaced. That litigation stands at most for the proposition that the ICC has discretion in some circumstances to consider § 20a issues without coming to grips with the question whether control of one carrier by another may be unlawful. Alleghany had acquired control of the New York Central without ICC approval. It applied to the ICC rather than to the Securities and Exchange Commission for approval of an issue of preferred stock. The ICC took jurisdiction on the ground that, while Alleghany was an investment company normally under the jurisdiction of the SEC, its control of Central made it a carrier subject to ICC regulation. The District Court set aside the order approving the issuance on the ground

that ICC jurisdiction to act under § 20a could not rest upon a control it had not approved. This Court reversed, pointing out that it would be contrary to the policy of the statute to oust the ICC of regulatory jurisdiction because a noncarrier had failed to abide by the law. On remand the District Court considered the illegality of Alleghany's control as relevant to the merits of the issuance under § 20a, and we reversed again, stating simply that the only issue left open on remand was whether the stock issue "as approved" was unlawful. 355 U. S. 415, 416. However this litigation may be interpreted, it wholly fails to support the proposition that, because § 20a was designed primarily to protect against fiscal manipulation, the ICC is relieved of the necessity of considering other issues germane to the transaction.

We conclude, therefore, that the ICC is required, as a general rule, under its duty to determine that the proposed transaction is in the "public interest" and for a "lawful object," to consider the control and anticompetitive consequences before approving stock issuances under § 20a (2). This does not mean the ICC must grant a hearing in every case, or that it may never defer consideration of issues which arise when special circumstances are present. But it does mean that, when the ICC exercises its discretion to approve issuances without first considering important control and competition issues, the reviewing court must closely scrutinize its action in light of the ICC's statutory obligations to protect the public interest and to enforce the antitrust laws. Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral. We turn now to this question, first with respect to the deferral of the control issue, and second with respect to the deferral of the anticompetitive issues.

### III.

REA's proposed issuance of a 20% stock interest to Greyhound undoubtedly raised a serious question whether control of its operations might pass to Greyhound. Control under § 5 must be judged realistically, and is a matter of degree. See *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125. Even the 20% acquisition standing alone might raise an issue of control necessitating greater consideration than given it by the ICC, but it is clear from REA's own evidence that the purpose of its negotiations with Greyhound was to bring the two companies into a joint alignment. The 20% stock issuance was treated by both as the first step of a more ambitious project, and as evidence of the seriousness of each other's intentions to that end.

What the ICC has done must, however, be placed in perspective. It has not denied that a substantial issue of control is present, and it has not refused to consider the issue. It has held only that consideration should be deferred for the 60-day period during which Greyhound has agreed to extend to REA stockholders an offer to purchase up to 1,000,000 shares. We have stressed the unsatisfactory consequences which often occur when agencies defer action and leave parties uncertain as to their rights and obligations. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 510. We might also observe that the ICC apparently could have avoided the deferral by requiring REA and Greyhound to reform their contract so that all the facts relevant to the control issue could be ascertained before approval was given under § 20a (2).[8] Nevertheless, we cannot say that the

---

[8] A change in the agreement providing that Greyhound should offer to purchase the stock held by the railroads before the issuance of the 500,000 shares would have developed the relevant facts, and made unnecessary postponement of the determination of either the control or competition issue.

ICC exceeded its discretion when it deferred consideration of the control issue; radical changes in the relevant facts may take place during the 60-day period, and it is highly unlikely that any harm can flow to appellants or to the public interest from a deferral limited to that issue.

Resolution of the "public interest" issue under § 5, requiring consideration of anticompetitive and other consequences, is required when the threshold fact of control or merger is established. But in this case, even assuming that the 20% purchase may amount to "control" under the existing stock distribution, events may occur during the 60-day period which might negate this possibility. Some railroads have indicated their intention to sell their REA holdings, but whether Greyhound or the dissident railroads wind up in a controlling position may depend on the extent to which the latter exercise their right of first refusal. The dissident railroads have made clear their intention to prevent Greyhound from acquiring any additional shares, but even if they obtain one-third of REA's stock they will be able to determine the composition of REA's Board of Directors. In either case, the added power in the hands of the dissident roads may, depending on the circumstances, lead the ICC to find that Greyhound had not acquired control.[9] Thus the control question can more realistically be resolved with finality after the 60-day period.

Moreover, the ICC reasonably concluded that allowing Greyhound tentatively to acquire the 20% stock interest would not prejudice appellants as to the control issue

---

[9] If the dissident REA railroad stockholders exercised their right of first refusal to buy the 1,000,000 shares the other railroad stockholders might sell, their combined stockholdings would be increased to over 50% of the REA shares. See Brief for the United States and ICC, p. 18, n. 9.

in light of the dissident railroads' position that Greyhound would not acquire "one additional share under the offer to purchase up to one million shares . . . ," and because Greyhound would be unable under REA's bylaws to control the board, since its five directors would be faced by 18 railroad directors, any 13 of whom would have the power to prevent any action proposed by Greyhound.

## IV.

The action of the Commission in deferring consideration of the anticompetitive issues stands on a different footing. The Commission's responsibility under § 5 and under the Clayton Act differs markedly, and the reasons which support an exercise of discretion as to the control issue are wholly inapplicable to the anticompetitive questions. There is, in short, no reasonable justification for deferring the Clayton Act questions.

The Commission is, of course, required to consider anticompetitive issues under the public interest standard of § 5, just as it must under the public interest standard of § 20a. But the duty under § 5, as we point out above, arises only after the threshold fact of control is established. No such preliminary finding need be made to trigger the ICC's duty under the Clayton Act. A company need not acquire control of another company in order to violate the Clayton Act. See, *e. g., United States* v. *du Pont & Co.*, 353 U. S. 586; *American Crystal Sugar Co.* v. *Cuban-American Sugar Co.*, 152 F. Supp. 387 (D. C. S. D. N. Y. 1957), aff'd, 259 F. 2d 524 (C. A. 2d Cir. 1958). Section 7 proscribes acquisition of "any part" of a company's stock where the effect "may be substantially to lessen competition, or to tend to create a monopoly." Moreover, the purpose of § 5 is significantly different from that of the Clayton Act. Section 5 is designed to enable carriers to seek and obtain approval of consolidations with other carriers, with immunity from the anti-

trust laws. When a carrier effects a consolidation without ICC authority, the Commission can of course act under § 5 (4). But, as the Commission has often held, the carrier must initiate consolidations under § 5, and it is reasonable to expect that carriers will seek the benefits of that provision. In contrast, the Clayton Act is prohibitive, and imposes a positive obligation upon the ICC to act. The Commission is directed, whenever it has reason to believe any carrier within its jurisdiction is violating § 7, to "issue and serve upon such person and the Attorney General a complaint stating its charges in that respect, and containing a notice of a hearing . . . ." 15 U. S. C. § 21 (b). Section 16, 15 U. S. C. § 26, excepts from the power of private persons to bring § 7 suits for injunctive relief all cases involving matters subject to ICC jurisdiction. By thus limiting the authority of private persons to institute court proceedings to enjoin § 7 violations, this provision underscores the ICC's responsibility to act when such violations are brought to its attention.

One of the principal justifications advanced for the ICC's deferral of the control issue is that the facts relevant to that issue may change so significantly during the 60-day period that the control question could be settled either way. No such possibility exists with respect to at least some of the anticompetitive issues presented by REA's application. We need not accept the argument of appellants, based upon the distinction between "express" and other forms of transport, see, e. g., *Railway Express Agency, Inc., Extension—Nashua, N. H.*, 91 M. C. C. 311, 322, sustained *sub nom. Auclair Transportation, Inc.* v. *United States*, 221 F. Supp. 328 (D. Mass.), aff'd, 376 U. S. 514, that the 20% stock acquisition would itself violate § 7 because REA controls 88% and Greyhound 7% of the "express" market. For if appellees REA and Greyhound are correct that, because of the increasing cross-competition among groups carrying

transport, it is impossible to categorize REA as a carrier of "express," then the claims of appellant truck lines, freight forwarders and trucking associations take on added significance. It is precisely the increasing diversification of REA's transport activity, together with Greyhound's considerable capacity and the economies and efficiencies the two companies intend to effectuate jointly, that concerns these appellants.

It is clear that REA and Greyhound contemplate major changes in their operation which could have a significant impact upon competition for express and other types of transport which they seek to carry. The "Memorandum of Understanding" into which the companies entered about three weeks before REA agreed to Greyhound's 20% stock acquisition contemplates efficiencies and savings through consolidation of facilities for terminal service, of garages, and of communications, advertising and sales forces. These changes might therefore realize large savings for both REA and Greyhound, and in this way and other ways significantly strengthen their competitive position. And the Memorandum expresses a determination to engage in aggressive action to capture larger shares of express and transport business, especially by utilizing Greyhound's bus operations as a complement to REA's air and rail service. "The consolidation of effort by the two companies," the Memorandum states, "would create a new market with revenue opportunity arising from a complete package express service to the public." The "new ability" of the air express service to reach off-airline points would add significantly to REA and Greyhound revenues, and the new market would have an estimated growth potential of 10% per year. Similarly, rail-bus service was expected to generate millions in "new business," and to "create a new capability for the two carriers to compete in the ltl [less-than-load] market. The only foreseeable limitation to the

growth of this service would be the physical space limitations of Greyhound's fleet."

There is nothing in the record to rebut the allegations of many of the appellants that cooperation between Greyhound and REA of the sort contemplated by the Memorandum aided by the 20% stock acquisition will result in serious harm to appellants individually and to the public interest which they serve. The freight forwarders fear a great reduction in their business, as do the bus companies. Some of the bus companies, which engage in commuter transport, claim that Greyhound-REA cooperation would deprive them of their express business, and that, since that business makes economically feasible their commuter operations, would compel the termination of services essential to the public interest.

It cannot be said with assurance that deferral of consideration of the anticompetitive issues will in no way prejudice appellants or the public interest. The fact that the railroads presently control the REA Board of Directors is hardly relevant to that question. It is not the possibility of control that may prejudice appellants and the public interest, but simply the fact that with Greyhound holding 20% of REA's stock there is likely to be immediate and continuing cooperation between the companies, cooperation which appellants claim will be to their detriment and which the Government concedes may be against the public interest. If appellants are correct, and if such an alliance would in fact be against the public interest, then § 7 of the Clayton Act requires that it be stopped in its incipiency. Cf. *FTC* v. *Dean Foods Co.*, 384 U. S. 597, 606, n. 5.

We are told that REA is in need of funds, and that ICC approval of the 20% stock acquisition assures that REA will obtain capital and gain a measure of independence from the railroads. There is certainly support for the position that REA needs to free "itself from the

control and domination previously exercised by its railroad shareholders over its operations." 80 ICC Ann. Rep., p. 22 (1966). The strong ties between REA and the railroads led to the operation of REA in the railroads' own interests, without regard to their coincidence with REA's best interests or the public interest. Prior to a 1959 agreement, generated in large part by REA losses, see *Express Contract, 1959, supra,* 308 I. C. C., at 546, REA was required to distribute traffic among carriers on the basis of existing traffic patterns, and the consent of rail carriers operating between given points was required before REA could utilize carriers other than railroads between those points. Changes in these limitations have enabled REA to finance some improvements and steadily to increase its corporate surplus. Study of REA Express, Staff Liaison Group V–C, CAB, FMC & ICC 24–26 (1965). But it does not follow that REA will be any better off in the long run, or that the public interest will be advanced, if its ownership shifts in part or entirely to Greyhound.

While the history of REA does not in itself provide a blueprint for its future, it does "afford a basis for considering the lawfulness of REA's status and activities, and the economic desirability of its apparent direction of growth." Study, *op. cit. supra,* at 3. That history indicates that there may be some relationship between REA's depressed state and its close ties with railroads. Before acting on this premise, however, the ICC must at least consider the question whether a given course of action will in fact alleviate the problem. If railroad ownership operated in the past to deprive REA of an opportunity to prosper and serve the public interest, it is not inconceivable that partial ownership by Greyhound will have the same result. Greyhound, presumably, is no less likely to act in its own interest. If the railroads operated REA, as appellees contend, to minimize competition for

transport generally between REA and the railroads, and for express between the railroads themselves and between railroads and other modes of transport, how will partial or complete ownership by Greyhound change things? Even if only partial ownership results, may Greyhound and the railroad owners operate REA so as to minimize competition between REA and themselves for transport generally? What effect, for example, would partial ownership by Greyhound have upon the recent efforts of REA to add to its express operations the hauling of larger and more varied volumes of freight, efforts which bring it into competition with Greyhound and other bus lines as well as with truck lines and freight forwarders? Moreover, what assurance is there that REA will not tend to route shipments via Greyhound in preference to more efficient or economical carriers or modes, just as the railroads bound REA to use their lines as opposed to other modes, absent their approval? We assume that REA needs funds and would be better off more independent from the railroads, but before the ICC can use these reasons to justify a diversification of ownership it must at least consider whether the specific action approved may operate to the detriment of REA or the public interest.

There is, finally, little merit to the Government's argument that deferral of the anticompetitive issues is strongly supported by considerations of administrative convenience. The only circumstance in which the anticompetitive issues may be eliminated from the case is if Greyhound, thwarted at the end of the 60 days in its plans to control REA, were to dispose of its 20% interest. But the ICC can hardly justify deferral of consideration of the consequences of a transaction on the possibility that the problems its approval creates may shortly vanish by a reversal of the transaction itself. Of course, if, as appellees claim, it is most likely that Greyhound will

acquire no further stock, then consideration of those consequences now would not be wasted effort. And the argument of wasted effort is still less persuasive if appellees are proved wrong and Greyhound does acquire more stock. For the most significant question which the ICC must face is whether it is in the public interest that REA continue to be owned by other transport companies, and specifically by Greyhound. Once this question is resolved as to the 20% stock acquisition, and the consequences of that acquisition are fully weighed, the ICC's task in any subsequent proceeding if Greyhound enlarges its stock interest will be far more manageable.

We therefore conclude that, although the possibility that Greyhound may not increase its holdings within the 60-day period may justify deferral of resolution of the control issue, it does not justify delay in consideration of the anticompetitive effects of the 20% transaction. The Government was correct in its position before the ICC that this record placed "before the Commission serious questions under section 7 of the Clayton Act," requiring a hearing.

The judgment of the District Court is reversed with direction to enter a new judgment remanding the case to the Interstate Commerce Commission for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, concurring in part and dissenting in part.

I agree with most of the Court's opinion, with its holding that competitive factors must be considered in a § 20a proceeding and with its ruling that a hearing should have been held by the Commission in this case before approving the issuance of the securities by Railway Express Agency, Inc., to Greyhound Corporation.

But I am doubtful about those parts of the Court's opinion which indicate that although the public interest requires the consideration of competitive factors in connection with the issuance of stock under § 20a, the public interest also demands that if a lessening of competition is found or threatened within the meaning of § 7 of the Clayton Act, the issuance must be disapproved. Under § 5 of the Interstate Commerce Act, competitive factors must also be considered in determining the public interest, but there a balanced view of the public interest permits the approval of a merger or consolidation despite any actual or probable competitive impact. Mergers which would violate § 7 are thus permissible under § 5 if found in the public interest but only those acquisitions of stock which are not suspect under § 7 of the Clayton Act are permissible under § 20a.

In the last analysis the Court rests this rather odd distinction on the Act itself—that is, Congress is said to have intended this very result because it provided in § 5 (11) that the approval of a transaction under § 5 relieves the parties from antitrust liability and did not so provide in connection with § 20a transactions. I do not think, however, that this ends the matter, and I find unconvincing the speculative reasons the Court gives for suggesting that Congress intended any such result.

Much more persuasive to me is the approach of *Pan American World Airways* v. *United States,* 371 U. S. 296. That case involved the Civil Aeronautics Act of 1938, 52 Stat. 973, re-enacted as the Federal Aviation Act of 1958, 72 Stat. 731, 49 U. S. C. § 1301 *et seq.,* which provided antitrust immunity for transactions approved by the Civil Aeronautics Board under §§ 408, 409, and 412. The course of conduct attacked by the United States under § 1 of the Sherman Act in *Pan American* was not, however, within any of these sections. The Court, nevertheless, held that the conduct was clearly of the kind

specifically committed to regulation by the Board under other sections of the Act and was unassailable in an independent civil action brought by the United States under § 1 of the Sherman Act.

In the case before us, § 20a (2) provides that it shall be unlawful for any carrier to issue securities unless approved by the Commission after finding that the issuance:

> "(a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

The Commission may grant an application under § 20a in whole or in part with such modifications and on such terms and conditions as the Commission may deem appropriate, and it may from time to time make such supplemental orders with respect to the transaction as it may deem necessary. § 20a (3). Moreover, it is expressly provided that "[t]he jurisdiction conferred upon the Commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein." § 20a (7).

Having these powers conferred upon it in the name of the public interest, the Commission may, in my view, approve the issuance of stock by a carrier if it deems the public interest requires it even though there may be a probable lessening of competition which otherwise would violate § 7 of the Clayton Act. This seems to be precisely what Congress intended by expressly providing in § 7 of the Clayton Act itself that "Nothing contained in this

section shall apply to transactions duly consummated pursuant to authority given by the . . . Interstate Commerce Commission . . . under any statutory provision vesting such power in such Commission . . . ." 15 U. S. C. § 18.

It makes very little sense to me to hold that a stock acquisition involving control may be approved if the public interest requires it, despite any actual anticompetitive impact, and yet to forbid the approval of an acquisition which falls short of control but which "may" injure competition within the meaning of the Clayton Act.

Thus while I agree that a hearing should be required before the Commission approves the issuance of the securities in this case, I would make it clear that competitive considerations are only some of the factors to be weighed in reaching a decision concerning the public interest, much as the Court has viewed the proceedings under § 5. *McLean Trucking Co.* v. *United States,* 321 U. S. 67. At the very least I would not now decide that the Commission is powerless to approve the issuance of securities under § 20a if it determines that the impact on competition would otherwise be barred by the Clayton Act.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

This case involves a proposed stock issue by appellee Railway Express Agency, Inc. (REA), of 500,000 shares of previously authorized but unissued shares of its common stock. Under § 20a (2) of the Interstate Commerce Act, 49 U. S. C. § 20a (2), this type of stock transaction must be authorized by the Interstate Commerce Commission, which must determine whether the issue is "for some lawful object within . . . [the applicant's] corporate purposes, and compatible with the public interest . . . ."

Under the proposed transactions REA contracted to sell this block of shares for $10,000,000 to the Greyhound Corporation, which would then offer to purchase within a 60-day period an additional 1,000,000 shares from existing stockholders, all of whom are railroads and all of whom hold rights of first refusal as to the sale of existing REA shares. Some of these railroad-stockholders have been opposed to Greyhound's entry into REA and have expressed their intention to exercise their pre-emptive rights. It is undisputed that if Greyhound nevertheless succeeds in purchasing these additional shares it would be in a position to exercise a substantial degree of control over REA, cf. *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 145, and that such control would require the approval of the ICC under § 5 (2) of the Interstate Commerce Act, 49 U. S. C. § 5 (2). It was also alleged by the United States as an intervenor before the ICC that the possible exercise of control by Greyhound over REA and an anticipated co-ordination of certain services by the two carriers [1] raised serious antitrust questions under § 7 of the Clayton Act, 15 U. S. C. § 18, which the ICC is bound to enforce as to regulated carriers, Clayton Act § 11, 15 U. S. C. § 21.

The Interstate Commerce Commission did not deal with the substance of these "control" and "antitrust" issues. It found that REA "urgently needs the proceeds of $10,000,000 . . . ," [2] and that it was not necessary, given

---

[1] The Commission found that REA had agreed "to consider seriously and work toward a long-term agreement between applicant [REA] and Greyhound to consolidate operating functions and facilities, and to cooperate in all lawful, feasible and jointly advantageous ways to effect economies, improve service and increase public receptivity and patronage . . . ." A "Memorandum of Understanding" between an official of each of the two companies contained some suggested methods for achieving these goals.

[2] The ICC's order dealing with the legitimacy of this transaction said: ". . . applicant urgently needs the proceeds of $10,000,000 in its

the uncertainty as to the future relationship of Greyhound and REA, to deal with the control issue at that time. The Commission noted specifically that "if in the future the acquisition of control or power to control, or other matter or transaction to which section 5 of the act applies, becomes imminent or apparent, the opportunity will be available for all interested persons to interpose their opposition . . . ."

On review, a three-judge District Court for the District of Colorado sustained the Commission's order, 255 F. Supp. 704. It read the ICC's decision, as does this Court, as saying only "that in the circumstances presented the public interest requires the issuance of the stock and that determination of the competitive effects will be appropriate for consideration after the chain of events started by the stock issuance is ascertainable rather than conjectural." *Id.*, at 709. The District Court then held that "[i]n the circumstances it is not our prerogative to interfere with what we deem to be a reasonable exercise by the Commission of its discretionary powers." *Id.*, at 710.

I would affirm this judgment of the District Court, and therefore must dissent from today's decision. The Court holds that "the ICC is required, as a general rule, under its duty to determine that the proposed transaction is in the 'public interest' and for a 'lawful object,' to consider the control and anticompetitive consequences before approving stock issuances under § 20a (2)." *Ante,* p. 498. The Court notes, however, that "[t]his does not

program of acquiring and modernizing terminals and equipment in order to keep operating costs at a reasonable level; that it is handicapped in borrowing to finance capital improvements because of its unfavorable debt-equity ratio; that the proposed issue will improve its ratio as well as reduce to some extent the amount of future borrowing required; that the price of $20 per share is fair and reasonable; and that the expenses of the issue are estimated at $15,000 . . . ."

mean the ICC must grant a hearing in every case, or that it may never defer consideration of issues which arise when special circumstances are present," *ibid.*, but concludes that while it was not an abuse of discretion to defer consideration of the "control" question raised by the intervenors, it was improper to refuse to deal with the "anticompetitive" issues at this stage. I believe that this decision misapplies the relevant statutes and seriously impedes sound administrative practice.

## I.

Section 20a (2) of the Interstate Commerce Act is concerned with new stock issues. Congress' dominant concern was "to maintain a sound structure for the . . . support of railroad credit," 1 Sharfman, The Interstate Commerce Commission 190 (1931),[3] and nothing in the legislative background of the section indicates that the words "for some lawful object within its corporate purposes, and compatible with the public interest" were intended to encompass issues of antitrust law. Of course the phrase "the public interest" is broad, and in the context of other legislation comparable terms

---

[3] The "public interest" of concern to Congress was the problem of watered stock. See, *e. g.,* statement of Congressman Rayburn: ". . . if we write into the law of the land a statute to the effect that before a railroad can issue new securities, before it can put them on the market, it must come before the properly constituted governmental agency, lay the full facts of its financial situation before that body, tell that body what it intends to do with the money derived from the sale of the issue of securities, and after it has received the approval of that regulating body and it goes out and puts those securities on the market, then the Interstate Commerce Commission by this law is empowered at any time to call it to account and have it tell to that regulating body that it expended the money, the proceeds of the sale of securities, for the purposes for which it had made the application." 58 Cong. Rec. 8376 (1919). See also statement of Congressman Esch, *id.,* at 8317–8318. See generally MacVeagh, The Transportation Act of 1920, at 486–492 (1923).

have been held to embrace antitrust matters. *E. g.,* Federal Communications Act, § 307, 48 Stat. 1083, 47 U. S. C. § 307, as construed in *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86. But the mere inclusion of such language in this instance is not the end of our inquiry, for § 20a must be read in its entirety and interpreted in conjunction with other sections of the Act.

In contrast to § 20a, which by its detailed and explicit terms deals only with the problem of fiscal responsibility,[4] § 5 of the Act, enacted at the same time,[5] deals specifically with problems of "control." Indeed, the standards laid out in § 5 are directly relevant to the various factual issues hypothesized by the Court in Part IV of its opinion. Section 5 does not deal solely with transfers of shares, but with any lease or contract between two carriers for the operation of their properties, §§ 5 (2)(a)(i), 5 (4); see

---

[4] Section 20a (2) reads in its entirety: "It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the Commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the Commission by order authorizes such issue or assumption. The Commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

[5] Both sections were parts of the Transportation Act of 1920, 41 Stat. 480, 494.

*Gilbertville Trucking Co.* v. *United States,* 371 U. S. 115, 125. It would thus appear that any type of agreement between Greyhound and REA for the integration of their operations would—with or without the sale of shares—fall within the purview of § 5.

Section 5 not only deals explicitly with problems of control, but it establishes the public interest criteria which the ICC is bound to use in making that type of inquiry. For example, the Commission must consider "(1) The effect of the proposed transaction upon adequate transportation service to the public; . . . (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." § 5 (2) (c). This Court has recognized that standards of market control in the transportation industry are different from those governing other business transactions: the ICC must take account of antitrust policy in judging the control questions under § 5, *McLean Trucking Co.* v. *United States,* 321 U. S. 67, but this interest is simply one of the relevant criteria, and if on balance the Commission finds a proposed undertaking to be in the public interest the statute authorizes a grant of antitrust immunity to the transaction. § 5 (11); *Seaboard Air Line R. Co.* v. *United States,* 382 U. S. 154; *Minneapolis & St. L. R. Co.* v. *United States,* 361 U. S. 173; *McLean Trucking Co.* v. *United States, supra.* Section 5 thus covers fully the problems of control; likewise, the antitrust issues are dealt with specifically in § 11 of the Clayton Act, which authorizes the ICC to enforce § 7 of that Act, forbidding the acquisition of stock the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." Hence these sections, and not § 20a, are the substantive provisions governing the Commission's jurisdiction in respect to the anticompetitive aspects of this case.

For procedural reasons, too, § 20a seems inappropriate as a vehicle to replace or augment § 5 of the Interstate Commerce Act and §§ 7 and 11 of the Clayton Act. When a carrier applies for authorization to issue stock, the Commission must give notice to the various States in which the carrier operates so that relevant state regulatory agencies, which also supervise the finances and corporate structure of these companies, may raise objections to the proposed transaction. The Commission need not, however, hold a hearing before approving the transaction. § 20a (6). In contrast, when the ICC deals with problems of control under § 5, it is bound not only to notify the various state authorities but also to "afford reasonable opportunity for interested parties to be heard." § 5 (2)(b). And § 11 of the Clayton Act requires the Commission to notify the Attorney General if it believes that any carrier is violating § 7, and the Attorney General has the statutory right to intervene in the mandatory hearing on the question.

Given the complexities of control and antitrust problems in the transportation field, and given the specific and detailed provisions of the statute in § 5, and in § 11 of the Clayton Act, devoted particularly to them, it seems to me quite evident that the sounder view of the statutory scheme is to regard § 20a as being limited to matters of corporate financing and § 5 and § 7 as being the source of the Commission's authority and duty to deal with these other matters.

None of the Commission cases cited by the Court in support of its position that § 20a was envisioned as also encompassing control and antitrust considerations is apposite. *Columbia Terminals Co.—Issuance of Notes,* 40 M. C. C. 288, dealt, as the Court notes, with § 10 of the Clayton Act, 15 U. S. C. § 20, which specifically requires common carriers in certain situations to sell securities "by competitive bidding under regulations to be prescribed by

rule or otherwise by the Interstate Commerce Commission." The ICC merely held that this statute had not been repealed by § 20a. The general language cited by the Court from *Stock of New Jersey, I. & I. R. Co.,* 94 I. C. C. 727, was written in a case in which the issue was whether the applicant railroad could pay an indebtedness to its sole stockholder, another railroad, through a distribution of stock as a dividend. The ICC held this method of financing acceptable; antitrust considerations were in no way involved.

The third ICC decision cited by the Court, *Chesapeake & O. R. Co. Purchase,* 271 I. C. C. 5, would seem, if anything, inconsistent with its view of § 20a. There the Commission was requested to approve an interlocking directorate, which is forbidden unless authorized by the Commission pursuant to § 20a (12) of the Interstate Commerce Act, 49 U. S. C. § 20a (12). In making its decision the Commission did not incorporate § 5 control standards into § 20a (12). Quite the contrary, it noted that "[t]he policy of the Congress as to consolidations, mergers, and other forms of corporate unification and association is now to be found in the provisions of section 5," *id.,* at 12; that no application under § 5 (2) had been filed; and that "[i]t follows that the evidence pertaining to control of the New York Central or ultimate unification of the two carriers is irrelevant to the principal issues before us, and may not be considered in disposing of those issues." *Ibid.* The Commission then determined, under its established standards for judging the acceptability of an interlocking directorate, *id.,* at 18, that such an authorization would be improper, but observed that "[i]f the applicants are firmly of the opinion that the proposed association will result in the benefits to the carriers and to the public which they contend we should find on the showing that they have made in this proceeding, there is no reason why they should not

file an application for some form of association under section 5 (2) of the act." *Id.*, at 41–42.

The lack of authority for the Court's view of § 20a is not limited to administrative decisions. In the complex *Alleghany Corp.* litigation, summarized by the Court, *ante*, pp. 497–498, this Court sustained the ICC's determination that it could act upon a § 20a application without involving itself in difficult issues of intercorporate control as the District Court had ordered. The protracted and tangled character of that litigation, until resolved in the interests of simplicity by this Court's affirmance of the ICC's approach, should be a warning of the unfortunate consequences that may follow judicial requirements complicating and proliferating administrative hearings in unfamiliar fields; this is especially so where there are, as here, numerous parties some of whom have a strong interest in achieving delay.

## II.

Although not accepting the reading of the Act which I have urged, the Court nonetheless appears to recognize that the issue of "control" *is* a separate one from that of financial regularity, and one that can appropriately be dealt with in a separate and subsequent proceeding. Since the Court also acknowledges, as it must, that at this later hearing REA and Greyhound may request a § 5 (11) exemption, and thus bring into play all the standards of § 5, I find the Court's insistence that this issue falls within the purview of § 20a rather than § 5 essentially an academic one. The ICC will still be able to conduct its hearings just as it wished to do here, except that its subsequent "§ 5 proceeding" will henceforth be labeled a "§ 20a and § 5 proceeding."

Given the Court's recognition that the ICC has discretion to postpone the "control" determination, I find

it difficult to accept its argument that "antitrust" factors may not similarly be postponed.

It should be recalled that the only matter raised in this application is REA's desire to issue 500,000 shares of its stock to "a non-railroad purchaser," which concededly would bring to the issuer capital funds required for investment purposes. Under the proposed transaction, after Greyhound purchases these shares it will extend an offer to purchase within 60 days an additional 1,000,000 shares, as to which other shareholders hold rights of first refusal. All parties are in agreement that control and antitrust problems will be raised if Greyhound is ultimately successful in effecting these additional purchases. The only question is whether the Commission can leave these questions for a later determination. Because of the uncertainty as to the outcome of the further stock purchase offer, the Court agrees that postponement of the control issue was proper. But this uncertainty is equally crucial to the Clayton Act issues. The likelihood of a Clayton Act violation will of course be increased if Greyhound obtains these additional shares and is in a position to control, and to consolidate operations with, REA. On the other hand, if the shares are bought by some of the appellants whose interests appear to be adverse to Greyhound, the possibility of substantial harm to competition will be minimal. The core of the Clayton Act question, then, is inexorably tied to the control question, and the Court does not deny that these problems overlap. In these circumstances I find it impossible to follow the Court in holding, on the one hand, that the control hearing was permissibly postponed, but, on the other, that the ICC abused its discretion in similarly deferring any Clayton Act hearing.

To require such a proliferation of hearings as to a single transaction—one involving a straightforward busi-

ness transaction negotiated in terms of existing market conditions and the existing needs of the parties—is bound to obstruct the smooth workings of the administrative process. The penetrating observations of Professor Jaffe seem to me especially pertinent in this situation:

> "I gather the impression that some judges who quite insistently display a 'correct' attitude of deference on substantive issues apply a different standard to procedural decisions: they do not hesitate to protract and to complicate the administrative process. Their premise may be that the considerations that dictate deference to substantive decisions are inapplicable to procedural ones. This is only partly true. . . . Since procedural decisions should be made to serve the substantive task, it follows that expertness in matters of substance are relevant to the exercise of procedural discretion.
>
> ". . . [An agency] must ration its limited resources of time, energy and money. It must devote them to those exigent and soluble problems which are most nearly related to its core responsibility. What problems *are* most exigent, how they can best be solved . . . are questions the solution to which peculiarly demands a feeling for the whole situation. . . . If a court is not as well fitted to solve substantive problems as the agency, if on this level intermittent, disjected criticism disperses accountability, how much more is this true where the deployment of forces is involved." Jaffe, Judicial Control of Administrative Action 566–567 (1965).

The courts have traditionally permitted busy agencies substantial flexibility in formulating their internal procedures, and encouraged their efforts to eliminate duplicative action and repetitive hearings. See, *e. g., Chicago & N. W. R. Co.* v. *Atchison, T. & S. F. R. Co., ante,* pp.

341–343; *Federal Power Comm'n* v. *Tennessee Gas Co.,* 371 U. S. 145, 153–155, where the Court approved a "two-step procedure" as "not only entirely appropriate but in the best tradition of effective administrative practice"; *United States* v. *Pierce Auto Lines,* 327 U. S. 515, 534–536; *Baltimore & O. R. Co.* v. *United States,* 386 U. S. 372, 459 (dissenting opinion); cf. *Fahey* v. *Mallonee,* 332 U. S. 245; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 152–154; *United States* v. *Illinois Central R. Co.,* 291 U. S. 457.

The allowance of such flexibility, and the exercise of prudence by the courts, is especially appropriate where, as here, the issue is not *whether* to hold a hearing but *when* to do so, and where there has been no showing that harm would come from deferring consideration of the antitrust issues. This is not a case in which a merger is about to be consummated, and in which it might be feared that the integration of two businesses will be impossible to "unscramble" at some future time. Compare *FTC* v. *Dean Foods Co.,* 384 U. S. 597. These issues concern, as the Court's parade of speculative examples indicates, *ante,* pp. 505–506, the implications of a possible future co-ordination of some carrier services between REA and Greyhound. But these matters will only crystallize for purposes of legal analysis when it is ascertained (1) what type of control, if any, Greyhound will have over REA; and (2) what type of co-ordinated activities are planned. None of these issues has been prejudged, and provisional relief can be granted by the Commission, if necessary, §§ 5 (2), (7), (9); cf. *Gilbertville Trucking Co.* v. *United States,* 371 U. S. 115, 129–131. The district courts likewise have authority to grant injunctive relief on application of the Commission. § 5 (8).

In these circumstances I do not believe it was an abuse of discretion for the ICC to authorize the issuance

of stock, postponing consideration of the control and antitrust issues until the transaction was completed some 60 days later. It is regrettable that the Court's preoccupation with the future antitrust possibilities of this situation, fully acknowledged by all but still entirely speculative, should have led it to interfere, so unnecessarily, with the obviously sensible course of procedure adopted by the Commission.

I would affirm the judgment of the District Court.