346 F.Supp. 1193 (1972)
MISSOURI PACIFIC RAILROAD COMPANY, Plaintiff,
v.
UNITED STATES of America and the Interstate Commerce Commission, Defendants,
and
Illinois Central Industries, Inc., a Corporation et al., Defendants-Intervenors.
No. 72 C 136(4).
United States District Court, E. D. Missouri, E. D.
August 9, 1972.
As Amended August 15, 1972.
*1194 Mark M. Hennelly, Guilfoil, Symington & Petzall, St. Louis, Mo., Leon Leighton, New York City, for plaintiff.
John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., for United States of America.
Fritz R. Kahn, Gen. Counsel and Geraldine R. Keyes, Atty., Interstate Commerce Commission, Washington, D. C., for I.C.C.
Voorhees & Summers, St. Louis, Mo., Robert Mitten, Howard D. Koontz, and John D. Morrison, Chicago, Ill., James N. Ogden, John W. Adams, Jr., Mobile, Ala., for intervening defendants.
Before MATTHES, Circuit Judge, and WANGELIN and COLLINSON, District Judges.
MATTHES, Circuit Judge.
This is an action by the Missouri Pacific Railroad Co. [MoPac], pursuant to 28 U.S.C. § 1336(a), to set aside the Report and Orders of the Interstate Commerce Commission [ICC] dated December 28, 1971, and March 6, 1972, which authorized the merger of the Illinois Central Railroad Co. [Central] and the Gulf, Mobile and Ohio Railroad Co. [Gulf] into a new railway system, the Illinois Central Gulf Railroad Co. [Central Gulf], to be controlled by Illinois Central Industries [Industries], a non-carrier holding company which presently controls Central. See Illinois Cent. G. R. R. Co.AcquisitionG.M. & O. R.R. Co., et al., 338 I.C.C. 805 (1971). Annulment of the order was also sought in a separate complaint filed by the Kansas *1195 City Southern Railway Co. in the United States District Court for the Western District of Missouri.[1] Separate three-judge courts composed of the same judges were convened pursuant to 28 U.S.C. § 2284, and temporary restraining orders were issued by consent (on March 16, 1972, in this proceeding) restraining implementation of the order pending disposition of this action. The cases were consolidated for argument and separate opinions are filed simultaneously today. See Kansas City Southern Ry. Co. v. United States, 346 F. Supp. 1211 (W.D.Mo.1972).

I. THE PROPOSED MERGER
Central and Gulf applied to the ICC on May 16, 1968, for authority under § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), to merge the two systems into a new system. The merger method they proposed was described by the ICC as follows:
"The Plan seeks to effect a tax-free reorganization of the three companies while permitting the carrier operations of Central and Gulf to continue uninterrupted. Central Gulf, the vehicle through which this merger is to be effectuated, is to be organized and incorporated in Delaware following approval herein. The Plan calls for Gulf to form Central Gulf and to assign and transfer to the latter all of its properties. In consideration therefor, Central Gulf would transfer to Gulf all of its voting stock, which will consist of 1,000 shares of no-par common stock. Gulf would then be merged into Industries. In turn, Central would transfer substantially all of its assets to Central Gulf, and would then be liquidated and dissolved. Industries would then remain as the surviving parent corporation owning all the capital stock of Central Gulf, which itself would succeed to all the rights, privileges, power, and property of each constituent railroad and would assume their liabilities and obligations."
Illinois Cent. G. R.R. Co.Acquisition G.M. & O. R.R. Co., et al., 338 I.C.C. 805, 809 (1971). Additionally, authority was sought for Industries to issue a new series of stock with which to effect the merger.
The system to be created, Central Gulf, will be primarily a north-south carrier situated in the Mississippi Valley. (See the appended map, identified in the ICC hearings as Finance Docket No. 25203 et al. Part 6, Witness F. M. Dowling.) Central Gulf will operate some 9,484 miles of track, as compared to the following mileage for other railroads in the area: Seaboard Coast Line-L & N, 14,830 miles; Southern Pacific, 13,328; MoPac, 12,324; and Southern, 9,076.

II. THE INVOLVEMENT OF THE UNION PACIFIC
The fact which is at the heart of MoPac's complaint is the ownership by the Union Pacific Railroad [UP] of stock in Central's parent corporation, Illinois Central Industries. This stock has ranged from 30% near the turn of the century, to 16% during these ICC hearings, to 12.2% now; the diminution resulting from stock exchanges in other mergers and acquisitions. Furthermore, the intervenors, Central and Gulf, contend the stock exchange involved in the instant merger will reduce UP's share to 10.4%. The present market value of this stock is said by MoPac to be $79.5 million.
The nexus between UP's stock in Central and this merger is MoPac's contention that through this stock UP controls Central, has controlled it since 1906 when E. H. Harriman sold his Central *1196 stock to UP, and therefore that UP will control the newly merged Central Gulf.[2]
The consequences to MoPac if such UP control exists is that UP, whose eastern terminus is now Kansas City, would acquire by this merger Gulf's routes out of Kansas City which connect with Central's important terminals at Chicago and St. Louis, and thereby would link UP's western system with its allegedly controlled Central system in Mid-America. As a result, MoPac alleges, UP will divert to Central Gulf almost all the business it now gives MoPac, and thereby will cripple MoPac's competitive capacity.
MoPac first raised the contention of UP control of Central on November 16, 1967, six months before Central and Gulf filed their merger application. MoPac's complaint was filed in the proceedings wherein UP seeks to acquire the Rock Island Line,[3] a merger which not coincidentally would also extend UP's lines from Kansas City to Chicago and St. Louis. By this complaint, MoPac sought an investigation by the ICC pursuant to § 5(7) of the Act to ascertain whether UP had violated § 5(4) of the Act by acquiring control of another carrier without authority from the ICC to do so.
In April of 1968, UP responded to this situation by filing with the ICC copies of trust agreements by which it placed all its holdings in Industries in three, separate voting trusts. On May 20, 1968, the ICC granted MoPac's request to withdraw its complaint seeking the investigation.
The issue of UP control of Central then arose in the present case when the Columbus and Greenville Railway Co., alleging UP control of Industries through a concert of the holdings and influence of UP, the Harriman family, Brown Brothers Harriman investment bankers [BBH] and Mr. Stephen Hord, a BBH partner who was then on the Executive Committee of Central,[4] moved to dismiss the Central Gulf merger proceedings for want of jurisdiction on the ground that UP was an indispensable party. MoPac subsequently filed a new control complaint pursuant to § 5(7) alleging control by UP of Central in violation of § 5(4). Since these complaints related to the question of a violation of § 5(4) rather than the propriety of this merger under § 5(2), they were separately *1197 docketed. Accordingly, the Hearing Examiner in the Central Gulf merger case excluded evidence on the control question as beyond his assignment.
Although the question of illegal control under § 5(4) was ruled irrelevant, the question of the effect of such control on the propriety of this merger was obviously relevant. On this point, the Examiner found that the voting trusts effectively insulated Central Gulf from control by UP. However, the Examiner suggested in his June, 1970, report that to avoid the lengthy investigation under § 5(4) and subsequent litigation which would delay this merger and the UP-Rock Island merger, UP should consider voluntary divestiture in the manner ordered by the ICC in the Norfolk and Western merger,[5] i. e., divestiture over a 10-year period.
UP acted upon the Examiner's suggestion and in August, 1971, filed in the separately docketed control case a stipulation between UP and its three trustees requiring the trustees to dispose of the stock over a 10-year period commencing when the ICC approved either the Central Gulf merger or the UP-Rock Island merger.
As will be discussed more fully below, the Commission accepted both the Examiner's finding that the trusts insulate Central Gulf from control by UP and UP's decision to divest over ten years.

III. THE PROCEEDINGS ON THE MERGER APPLICATION
Central and Gulf made their application for merger authority on May 16, 1968. Thereafter, the ICC held 73 days of hearings between November, 1968, and August, 1969. Among the protestants and intervenors were the United States Department of Justice Antitrust Division, 19 railroad companies (including the Chicago, Rock Island and Pacific; Louisville and Nashville; Chicago and North Western; St. Louis-San Francisco; Denver and Rio Grande Western; and Chicago, Milwaukee, St. Paul and Pacific), two ports and one state railroad commission. Of these, only MoPac and Kansas City Southern have opposed the merger in court.
The Hearing Examiner filed his 219 page Recommended Report and Order in June, 1970. After exceptions thereto were filed, the ICC heard oral argument on February 17, 1971, and filed its Report and Order on December 28, 1971. The Chicago & North Western joined MoPac and Kansas City Southern in seeking reconsideration of the Order. Accordingly, the Commission, on January 31, 1972, stayed its order, then on March 6, 1972, denied reconsideration and reaffirmed the order authorizing the merger.
In deciding whether the merger met the dispositive statutory command that it be in the public interest, the Commission found first that the economies it would allow Central and Gulf to effect would produce a new increase in pre-tax income of $12 million, as well as producing faster and cheaper service for shippers and consumers.
Secondly, as to the anticompetitive effects of the merger, the Commission found that three, small intrastate carriers could not survive the merger, and on their requests ordered that they be included in Central Gulf.[6] But, as to the other carriers, the ICC found the business to be diverted from each would be negligible, and that ample competition from carriers by rail and other modes would remain. 338 I.C.C. at 877. Specifically, the Commission determined that MoPac would lose only 0.56% of its general operating revenue, a sum which MoPac concedes would not be sufficient to make this merger not in the public interest.
*1198 Finally, and these in effect are the conclusions which MoPac contests, the Commission determined (1) that it need not complete the separately docketed control investigation because, it held, the voting trusts and divestiture agreement, (which it made conditions to the merger) insulated Central Gulf from such control; and (2) that ten years was an appropriate period for divestiture in order to prevent economic dislocation from a large forced-sale.[7]
Accordingly, the ICC entered an order approving the merger with the following conditions: (1) the inclusion of the three railroads mentioned above; (2) divestiture by UP of its trusteed stock in Industries over a 10-year period; (3) prohibition of the trustees from selling any of the stock to UP, its parent Union Pacific Corporation, Brown Brothers Harriman, the Harriman family, or the successors, assigns or associates, etc., of any of them; (4) inclusion in UP's quarterly reports of a progress statement on the divestiture; (5) a report to the ICC after each Industries shareholders meeting of how the trusteed stock was voted; (6) a report to the ICC on how Mr. Hord or his successor voted as a director; (7) direction to Industries to reveal to the Commission the amount of its outstanding stock owned by UP Railroad, UP Corporation, Brown Brothers Harriman, members of the Harriman family, "and their associates, affiliates, representatives, successors, assigns and/or heirs. . . .," 338 ICC at 873; and (8) retention of jurisdiction by the ICC for five years to deal with any problems which may arise from the merger, and "to resolve the issues regarding the alleged common control of applicants and [UP] . . . and to take such measures, including . . . remedial steps deemed necessary for this transaction to remain in the public interest. . . ." Id.

IV. MOPAC'S CONTENTIONS
The essential question the ICC must determine under § 5(2) in each merger application is whether the merger is in the public interest. And, of course, "it is not the role of this Court to arrive at its own determination of the public interest on the facts of this case. Our appellate function in administrative cases is limited to considering whether the announced grounds for the agency decision comport with the applicable legal principles. SEC v. Chenery Corp., [318 U.S. 80, 87-88, 63 S.Ct. 454, 459-460, 87 L.Ed. 626] . . ." Port of Portland v. United States, 408 U.S. 811, 92 S.Ct. 2513, 33 L.Ed.2d 723 (1972). However, one of the legal principles applicable here is that the ICC cannot merely conclude a merger is in the public interest while refusing to investigate a facet of it which may affect its impact on the public interest. Id. It is on this point that MoPac has joined issue.
Specifically, MoPac contends that until the Commission ascertains whether UP has power to control Industries it cannot decide whether this merger is in the public interest or whether the 10-year period for divestiture adequately protects MoPac. MoPac agrees with the ICC that an independent *1199 Central Gulf would divert only negligible traffic from MoPac. Hence, counsel informed us at oral argument that the "Missouri Pacific's position in this complaint is that we have no objection whatsoever to the merger itself. . . ." Transcript at 3. But MoPac contends a Central Gulf controlled by UP would divert business amounting to 40% of MoPac's post-tax net income[8] and thereby jeopardize MoPac's competitive position contrary to the public interest. Similarly, MoPac contends that allowing UP ten years to dispose of its Industries stock gives UP ten years to profit by diverting traffic to Central Gulf, and MoPac contends the ICC cannot merely conclude that ten years is necessary to effect divestiture without economic dislocation but must conduct a formal inquiry into the period necessary to accomplish that purpose.
Accordingly, the narrow issue raised by this complaint is whether the ICC acted within legal limits in approving this merger without completing the investigation of the alleged § 5(4) violation and in allowing UP ten years to divest itself of its Industries stock without conducting a hearing to ascertain whether complete divestiture should be a condition precedent to the merger.

V.
In considering MoPac's contentions, our touchstone must be that the national transportation policy articulated by Congress favors railroad mergers. Indeed, such mergers are, "upon approval by the Commission, . . . immunized from the operation of the anti-trust laws . . .," Northern Lines Merger Cases, 396 U.S. 491, 508, 90 S.Ct. 708, 716, 24 L.Ed.2d 700 (1970); although the "curtailment of competition" is a factor to be considered in determining whether a proposed merger is in the public interest and will "assist in effectuating the over-all transportation policy." McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 381, 88 L.Ed. 544 (1944). See especially, Northern Lines Merger Cases, 396 U. S. at 506-514, 90 S.Ct. 708, 24 L.Ed.2d 700. However, as set out above, the ICC must consider all facets of the merger relevant to the public interest.[9] This, of course, is what MoPac contends the ICC failed to do here, but we do not agree and therefore decline to disturb the order.[10]
In contending that the ICC must complete the separately docketed control investigation before approving the merger, *1200 MoPac by necessity contends that investigation is the only way to determine both whether such control exists and, if so, whether it renders this merger not in the public interest. That contention is incorrect for three reasons.
First, the control complaint simply alleges that UP has violated § 5(4) by acquiring control of Central without obtaining the approval of the ICC. Control itself is neither sinister nor illegal if properly approved. What must be shown is that the alleged control by UP renders this merger not in the public interest.
Second, MoPac attempts to make such a showing by saying that UP will be induced by its beneficial ownership of 10% of Industries to divert to Central Gulf enormous amounts of traffic it would otherwise route over MoPac. But this is the second fallacy of MoPac's argument. If the evil MoPac sees is diversion resulting from UP's beneficial ownership of stock, then it is irrelevant whether the § 5(4) investigation will show that UP has control of Industries through historical ties and subtle influences. The extent of UP's beneficial ownership is already known and presumably was a factor in the ICC's expert prediction that the traffic to be diverted from MoPac will be negligible.
Third, even if it is control rather than beneficial ownership that is important, we agree with the ICC that the voting trusts have effectively insulated Industries from direct control by UP. Indeed that is precisely what the Commission and the courts held when it was Central contesting the effectiveness of trusts created by MoPac. See Missouri Pac. R. R. Co.ControlChicago, & E. I. R. R. Co., 327 I.C.C. 279, 319-21 (1965), sustained sub nom. Illinois Cent. R. R. Co. v. United States, 263 F.Supp. 421 (N.D.Ill.1966), aff'd per curiam, 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967). Furthermore, we attach considerable significance to the conditions the Commission appended to its order which will provide ample information of any attempt by UP to exercise indirect control of Industries[11] and which retain jurisdiction for remedial action in that event.[12] These conditions lead us to believe that the Commission would, as it should, act expeditiously in the event UP engaged in any of the practices which are of so much concern to MoPac.
In sum, we hold it is not necessary in this case to complete the control investigation before approving the merger. The only adverse consequence MoPac envisions is diversion of traffic, but it explains that diversion results not from control but from beneficial ownership of stock. Since the extent of UP's holdings was known when the Commission made its diversion estimates, we cannot say those estimates rest upon insubstantial evidence. Similarly, since, as MoPac concedes, the rate of diversion estimated by the Commission is negligible, we see no harm that can result from allowing UP ten years in which to divest its stock. Accordingly, we do not believe the order approving the merger is vitiated by the ICC's failure to ascertain *1201 if ten years is necessary to effect divestiture without economic dislocation.[13]
"The function of the reviewing court . . . is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law . . . the reviewing court is without authority to intervene."
United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946). We find no prejudicial departure from the law in the decision to allow ten years for the ordered divestiture.
There being insufficient reason to disturb the order of the ICC approving this merger, the complaint is dismissed, and the temporary restraining order heretofore issued is ordered dissolved.

*1202 APPENDIX
 *1203

*1204 WANGELIN, District Judge (dissenting).
This action was initiated by a complaint filed March 8, 1972, by the Missouri Pacific Railroad Company (Mo Pac), plaintiff, against the United States of America and the Interstate Commerce Commission (I C C), defendants, to set aside the order and report of the I C C dated December 20, 1971, in Finance Docket No. 25103. This action was brought pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321-2325 inclusive.
By its order the I C C approved and authorized the carrier initiated merger of the Illinois Central Railroad Company (Central) and the Gulf, Mobile and Ohio Railroad Company (Gulf) into a new railroad company, the Illinois Central Gulf Railroad Company (Central Gulf). Simultaneously, the order permitted Illinois Central Industries (Industries), a non-carrier holding company, which is presently in control of Central, to acquire sole control of Central Gulf through stock ownership. The I C C further ordered the inclusion into the merged railroad three small independent railroads which sought such relief.
This action and a companion action (No. 20177-2) came on to be heard on the merits by the Court on May 22, 1972. From the decision of my brothers on this three judge panel to deny the relief sought by the plaintiff in this action (72 C 136(4)), I respectfully dissent.
The history of the instant controversy dates as far back as November, 1967, when Mo Pac filed a complaint with the I C C seeking an investigation pursuant to 49 U.S.C. § 5(7) (§ 5(7) of the Interstate Commerce Act of 1940) to determine whether or not Union Pacific Railroad Company (Union Pacific), Industries, or Central is violating the control proscriptions of 49 U.S.C. § 5(4). At that time the I C C was considering the merger applications of Union Pacific, the Chicago, Rock Island and Pacific Railroad Company, and the Southern Pacific Company, which merger applications will hereafter be referred to as the "Rock Island" proceedings (Finance Docket No. 22688). It is my understanding that the Rock Island proceedings are still pending. By that complaint Mo Pac asserted that Union Pacific owned 24.20% of Central. Mo Pac sought an investigation of the existence of control relationship between Union Pacific and Central.
Union Pacific, Industries and Central denied that a basis for mounting such an investigation existed and moved to dismiss. In a reply filed February 8, 1968, with the I C C, Mo Pac withdrew its suggestion that the requested investigation be conducted as a part of the Rock Island proceedings and that, to avoid delaying said proceedings unduly, it be conducted independently. Mo Pac further asserted that the request for an investigation was not predicated upon the proposed Rock Island merger but rather its fear of damages resulting from the power of Union Pacific to control Central.
By three similar agreements dated March 22, 1968, Union Pacific placed in three irrevocable trusts 1,432,880 shares of common stock which it owned in Industries. Approximately one-third of such shares were thereby transferred to each of the trustees, Seattle-First National Bank, United States Trust Company of New York, and United California Bank. These trusts provide, inter alia, for the delivery by Union Pacific to the trustees of all the stock in Industries now owned or to be acquired by Union Pacific or any affiliate of Union Pacific; that the trusts shall be irrevocable; that the trust stock be registered in the names of the trustees; that the trustees exercise all voting rights; that the trustees use their best judgment in voting in the election of suitable directors of Industries; that the trustees shall vote the trust stock so that during the duration of the trusts there shall be entire independence of directors and management between Union Pacific and Industries, and Union Pacific and any affiliate of Industries; that the trustees *1205 shall not vote the trust stock, without the consent of the I C C, so that any officer or director or nominee or representative of Union Pacific shall be elected an officer or director of Industries or of any affiliate of Industries; that, the foregoing notwithstanding, the trustees may, if necessary, vote for the approval of such operating, trackage, engineering and traffic arrangements as are customary and desirable between railroads and as may be agreed upon between Union Pacific and Industries or any affiliates of Industries; that the trustees shall execute and deliver to Union Pacific certificates of the beneficial interest in the trust stock; that, if Union Pacific pledges the trust certificates of beneficial interest in the trust stock and defaults in respect to the indebtedness secured by the pledges, the trustees shall vote the trust stock affected in accordance with the written directions of the pledgee; that the trustees shall pay to the holder of the certificates of beneficial interest the dividends paid upon the trust stock; and that dividends in voting stock of Industries or any of its common carrier affiliates shall be held as trust stock.
The trust agreements further provide, in section 7 thereof, that Union Pacific may at any time dispose of the trust stock and that the trustees shall transfer the sold stock to a buyer who is not an affiliate of Union Pacific; that the trusts will terminate as to that portion of the stock so transferred; that the trustees shall dispose of the trust stock according to the terms of an order of the I C C, thereby terminating the trusts; and that the trusts will terminate on March 21, 1978, if not earlier by reason of other provisions of the trusts.
These trust agreements were filed with the I C C on April 4, 1968.
By a supplemental pleading filed with the I C C on April 18, 1968, Mo Pac allowed that "the trust agreements fully effectuate any relief which might be afforded by the Commission . . . ." Mo Pac Supp. Pleading, F.D. 24828, p. 4. Mo Pac requested leave to withdraw its complaint. By its order dated May 20, 1968, in Finance Docket No. 24828, the I C C dismissed Mo Pac's complaint subject to an amendment of the trusts, sought by Mo Pac, deleting language in the trusts which allowed consultation between the trustees and the counsel for Union Pacific.
On May 16, 1968, Central and Gulf applied to the I C C for approval of the merger which is the subject matter of the I C C order that Mo Pac seeks to set aside in the instant action. Hereafter, said merger proceedings will be referred to as the "Central Gulf" proceedings.
On November 8, 1968, the Columbus and Greenville Railway Company (C&G) moved to dismiss the Central Gulf proceedings alleging that Union Pacific and Brown Brothers Harriman & Co. (BBH) "had power to control Industries and Central, and that their failure to join as parties applicant leaves [the I C C] without jurisdiction . . . ." Illinois Central Gulf Railroad Company AcquisitionGulf, Mobile & Ohio Railroad Co., Illinois Central Railroad Co., et al., F.D. 25103, 333 I.C.C. 805, 865 (Dec. 20, 1971).
In December, 1968, Mo Pac filed a new complaint with the I C C alleging that the aforementioned trusts did not effectively insulate Central from Union Pacific and BBH. This complaint was assigned to Finance Docket No. 25426. Mo Pac on June 17, 1970, petitioned for a hearing and discovery regarding this complaint "alleging that the control or management of Central in a common interest with [Union Pacific] is continuing despite trusteeing of stock in that [Union Pacific], Industries, Central and the designated trustees have participated in perpetuating the common control and management in violation of section 5(4)." Ibid.
On April 25, 1969, the Chicago and North Western Railway Company (CNW) moved to dismiss the Central Gulf proceedings because the absence of Union Pacific deprived the I C C of jurisdiction *1206 since it was a necessary party. Subsequently, on January 21, 1970, CNW petitioned for an investigation of whether or not the Harriman family or BBH has the power to control Union Pacific Company, Union Pacific, Industries, and Central. This petition was also assigned to Finance Docket No. 25426.
During the Central Gulf hearings CNW attempted to introduce evidence relevant to the "control" issue, which permeates this entire controversy. "The examiner excluded these and other such offers of proof as being beyond the scope of his assignment. . . ." Ibid. at 865.
On June 9, 1970, the hearing examiner served his report, deferring the motions to dismiss and finding, inter alia, "that the trust agreements properly insulated [Union Pacific] from any control of Industries and Central by virtue of stock ownership." Ibid.
In his report the hearing examiner suggested sua sponte "that Union Pacific and/or BBH voluntarily consent to terminate the stock ownership in Industries in a manner similar to that of the Pennsylvania Railroad in the Norfolk & Western merger. The following pertinent portion of the hearing examiner's report is taken from the brief of the defendant interveners in this action at pp. 46-48:
The examiner is convinced, in view of the threat of litigation over the control issue, that the possibility of expedited consummation of the herein recommended merger of Central and Gulf, would be remote or nonexistent. Should it be determined that an investigation of the alleged control by Union Pacific and/or Brown Brothers is required, much time would be consumed in the processing of hearings, decisions, and judicial review, as required. Also, it is conceivable that the investigation might establish findings that would require reopening the record herein for evidence of policies influenced by persons or corporations not now parties to this proceeding. Orderly procedures, perhaps, would indicate that a more reasonable approach to the problem should be sought by the parties and by others who may be interested in an early final outcome.
A satisfactory solution is suggested by the decision in the Norfolk & Western merger case, supra. Therein, conditions prescribed by the Commission were voluntarily accepted by the then Pennsylvania Railroad agreeing to divest itself of its financial interest in the Norfolk & Western. Perhaps in this proceeding, Union Pacific could find it advantageous to arrange to advise the Commission that Union Pacific and/or Brown Brothers would voluntarily consent to terminate their stock ownership in Industries and its related carriers in the manner that Pennsylvania did in the Norfolk & Western case.
Consideration should be given to the acceptance of divestiture of the trusteed stock of Industries and/or Central; and the termination, if any exists, of control or the appearance of control through common directors or other forms of interlocking directorships existing between the aforesaid corporations. The actual disposing of Central's securities could be within an agreed reasonable period of time after consummation of the Central Gulf Merger.

In essence, the action to be agreed upon should be tailored to terminate the power by the Union Pacific interests to exercise direct or indirect control by means of any of the forms prohibited by the language or the intent of Section 5(4). In that sense, adoption of each of the requirements contained in the Norfolk & Western conditions should be weighed. Of course, the existing voting trusts would serve as insulation during the period required to effect complete divestiture. Until the stock interest is entirely disposed of, appropriate periodic reports should be filed with the *1207 Commission to detail the current state of the Union Pacific interests in the Illinois Central corporations. Because of the posture of the record, the option to act as suggested, or to do otherwise, necessarily rests with the applicants. (Emphasis supplied.)
In its exceptions to the hearing examiner's report Mo Pac sought protection from Union Pacific's control of Central urging that the I C C determine the control issue before approving the merger. Brief of defendant interveners at p. 48.
On January 5, 1971, the I C C expressed its position "that the most expeditious way to resolve the several issues raised by the complaint in Missouri Pacific Railroad Company v. Union Pacific Railroad Company et al., Finance Docket No. 25426, is to hold the complaint proceeding in abeyance until the issuance of the report by the Commission in the Rock Island Merger and in Illinois Central Gulf Railroad Co.Acquisition Gulf Mobile & Ohio Railroad Co. et al., Finance Docket No. 25103." I.C.C. Notice, F.D. 25103 et al., Jan. 5, 1971.
In the complaint proceeding (Finance Docket No. 25426) Union Pacific filed a stipulation dated August 11, 1971, between itself and the stock trustees whereby the trustees would dispose of the trust stock, if the I C C approves either the Central Gulf applications or the Rock Island applications. The disposal would be effected within ten years after the consummation of the first of the mergers.
By its order dated December 20, 1971, the I C C approved and authorized the Central Gulf merger subject to the voluntary stock divestiture by Union Pacific.
On January 27, 1972, Mo Pac petitioned for reconsideration of the I C C report and order requesting that Union Pacific divest itself of the Industries stock before, and as a condition precedent to, consummation of the Central Gulf merger. By order of March 2, 1972, the I C C denied the petition.
Thereafter Mo Pac initiated the instant action.
Mo Pac complains of the I C C merger order for the following reasons: (a) the I C C failed to require Union Pacific to divest all of its Industries stock before and as a condition precedent to consummation of the Central Gulf merger; (b) the I C C failed to investigate the allegations regarding Union Pacific's power to control or manage Industries and Central and the merged Central Gulf; (c) the I C C failed to require Union Pacific to become a party to the instant proceeding; (d) the I C C failed to estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation, and the irreparable injury which Mo Pac will suffer therefrom; and (e) the I C C denied Mo Pac the inexorable safeguard of a fair and open hearing.
Gulf, Central and Industries were granted leave by the Court to intervene as parties defendant.
The scope of review which this Court must exercise in reviewing the administrative order before it is circumscribed by section 706 of Title 5, United States Code. Minneapolis & St. Louis Railway Co. v. United States et al., 361 U.S. 173, 192, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). That section provides as follows:
Scope of Review.
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

*1208 (B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
The merger proposal which is the subject of the I C C order before the Court was submitted to the I C C under the provisions of section 5(2), Title 49 of the United States Code. If the I C C finds that the merger "will be consistent with the public interest", it is required to approve and authorize the transactions which will result in the merger. 49 U.S.C. § 5(2) (b). The Commission did so find that the proposed merger was consistent with the public interest. Illinois Central Gulf Railroad Co., supra at 874.
A condition upon which the I C C approval and authorization is based is the complete divestiture within ten years by the above mentioned trustees of their entire stock holdings of Industries, according to the terms of the agreements of August 11, 1971, between the trustees and Union Pacific. Ibid. at 870.
In resolving the merits of this action it is not for this Court to decide whether or not plaintiff has shown that the alleged control by Union Pacific renders the instant proposed merger not in the public interest. Such an approach requires this Court to define the public interest under the facts before us; such is beyond the scope of judicial review. Penn-Central Merger Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). It is rather our function to "determine whether the Commission has proceeded in accordance with law and whether its findings and conclusions accord with the statutory standards and are supported by substantial evidence." Ibid at 499, 88 S.Ct. at 608.
I find and conclude that the instant report and order of the I C C must fall because, first, it failed to include a finding of whether or not an illegal control relationship exists, and, second, the statutory finding that the divestiture condition is fair and reasonable is not supported by substantial evidence.

Control
The existence of illegal control and the effectiveness of the stock trusts are issues which permeate this controversy. The January, 1971, action of the I C C separated them from the instant merger proceedings for the purpose of investigatory fact finding. Nevertheless, the I C C deemed one aspect of these issues to be sufficiently relevant for discussion in the instant report, i. e. the trusteed stock. In its analysis the I C C takes the position, along with the hearing examiner, that the stock trusts are effective to insulate Central and Industries from Union Pacific. By this action it has chosen to consider one aspect of control while denying the relevance of those issues and facts which may be unearthed in the Finance Docket No. 25426 proceedings. Thus, the I C C has denied, in the instant proceedings, the "broad scope" of "control" which is established by 49 U.S.C. § 1(3) (b). Alleghany Corporation et al. v. Breswick & Co. et al., 353 U.S. 151, at 163-164, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957).
The I C C argues that it has unbridled authority to determine its procedural approach to a given case and to separate complex issues, and that the control issue is mooted by the divestiture provisions of the trusts and its order. I.C.C. *1209 Brief at pp. 44 and 47. The effect of these arguments in this case is to propose that the I C C has the authority, first, to assume by implication that there presently exists an illegal control relationship which must be remedied, second to assume what the effects of such control are, and, third, to fashion a remedy based upon these assumptions. Under the facts of the case before us, I disagree that the I C C has such authority.
The argument that the I C C has unbridled authority to separate and defer the issue of the existence of illegal control has been effectively put to rest. Denver and Rio Grande Western Railroad Co. et al. v. United States et al., 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967), rev'g in part 255 F.Supp. 704 (D.Colo.1966). In the Denver action plaintiffs attacked an order of the I C C authorizing a stock issuance transaction pursuant to 49 U.S.C. §§ 20a and 314. A complaint filed with the I C C alleged that the transaction would result in illegal control and requested a § 5(7) investigation. It was also alleged that § 7 of the Clayton Act (15 U.S.C. § 18) was violated. No evidentiary hearing was held and a § 5(7) investigation was deemed to be inappropriate. The three judge District Court dismissed the action. Ibid., 255 F.Supp. at 706. In so doing, the District Court construed the effect of the Breswick decisions, cited at p. 708, to be
"that the Supreme Court has left open the question of whether, when a control question is raised, it must be decided in advance of a § 20a approval of the issuance of stock. In our view a categorical answer cannot be given . . . Generally, the question of control must be answered on a case by case basis." Ibid. at 709.
The District Court concluded that the two issues, control and anti-competitive consequences, were properly deferred.
In its opinion the United States Supreme Court set out the general rule which requires the I C C
under its duty to determine that the proposed transaction is in the "public interest" and for a "lawful object," to consider the control and anticompetitive consequences before approving stock issuances under § 20a(2). This does not mean the ICC must grant a hearing in every case, or that it may never defer consideration of issues which arise when special circumstances are present. But it does mean that, when the ICC exercises its discretion to approve issuances without first considering important control and competition issues, the reviewing court must closely scrutinize its action in light of the ICC's statutory obligations to protect the public interest and to enforce the antitrust laws. Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral. Ibid. 387 U.S. at 498, 87 S.Ct. at 1762.
In this case the Supreme Court agreed that the control issue was properly deferred because (a) the period of deferral was but 60 days, (b) during this period of time radical changes in the facts relevant to control might occur, and (c) "it is highly unlikely that any harm can flow to appellants or to the public interest from a deferral limited to that issue." Ibid. at 500, 87 S.Ct. at 1763.
The Supreme Court disagreed with the District Court, however, on the deferral of the anticompetitive aspects. In so ruling on this issue the Court considered that (a) the 60 day deferral period would not result in a sufficiently significant change in the facts relevant to the anticompetitive aspects of the transaction, (b) it could not be said that deferral would in no way prejudice the appellants or the public interest, (c) the proposed transaction will not automatically benefit the parties involved or the public interest, and (d) administrative convenience is not a sufficient justification for deferral because the problems created by approval may possibly vanish.
*1210 The Denver criteria are eminently applicable to the action before us. I conclude that by its deferral of the control issue the I C C has not sufficiently observed its statutory obligation to protect the public interest. The divestiture provisions of the instant administrative order are integral parts of the I C C approval of the merger transactions. Mo Pac has alleged that it would suffer significant injury as a result of traffic diverted to a Central Gulf controlled by Union Pacific. It is argued that deferral of the control issue is justified by the 10 year divestiture condition. This is much like saying that, while Union Pacific may have the ability to so injure Mo Pac, it has 10 years in which to cease.
Furthermore, by its implied assumption of illegal control, the I C C contravenes the provisions of 49 U.S.C. § 5(7) which reads in pertinent part:
If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation. (emphasis added).
In exercising this authority the Supreme Court has said that the I C C "has a heavy responsibility to tailor the remedy to the particular facts of each case so as to best effectuate the remedial objectives. . . ." Gilbertville Trucking Co., Inc. et al. v. United States et al., 371 U.S. 115, 130, 83 S.Ct. 217, 226, 9 L.Ed.2d 177 (1962). In reviewing the basis for the remedy imposed by the order before us now this Court must find evidence in the record "that the parties were heard on the issue [and] that the proper standards were applied." Ibid. By its deferral of the control issue, the I C C has prevented the parties from sufficiently being heard.

Substantial Evidence
An analysis of whether or not there is substantial evidence to support the divestiture condition of the order is not limited to whether or not divestiture is available as a remedy as a matter of law, or to whether or not the ten year period for the divestiture is a limitation which is available also as a matter of law. The I C C would have this Court so limit its analysis.
The bases upon which the I C C grounds the divestiture condition are: (a) the assumed existence of the control relationship, and (b) the fact that divestiture is the "most radical" remedy that the I C C could afford Mo Pac in any event. Tr. p. 38.
The bases upon which the ten year limitation are founded are as follows: (a) this is the same period of time prescribed by the I C C in Norfolk and Western Railway Company, and New York and St. Louis Railroad Company Merger, etc., 324 I.C.C. 1 (1964); (b) the ten year period would avoid a serious maladjustment in the value of the securities; (c) this period would preclude adverse effects upon existing security holders and upon the stability of the carriers; and (d) this period would prevent the delicately balanced stock exchange ratios from possibly being thrown out of phase. Illinois Central Gulf Railroad Co., supra. at p. 869.
While the I C C did approve a ten year divestiture period during which the Pennsylvania Railroad was to dispose of its stock holdings in the Norfolk & Western railroad, it did so upon the following considerations: (a) an actual control relationship was established; (b) the ability of this control relationship to influence the routing of traffic over the lines of the new merger railroad was established (a matter relevant to the instant action); (c) the Pennsylvania railroad would not even acquire 671,691 shares in Norfolk & Western for six years, following which acquisition it had to divest itself of them; (d) ten years would allow time for the scheduling of bond redemptions, necessary for the release of pledged stock, so to minimize the accrual of premiums; (e) the I C C analyzed the number of Norfolk & Western common *1211 stock traded each year for the previous ten years on the New York exchange; and (f) the I C C determined that ten years would allow the Pennsylvania ample time in which to take advantage of favorable markets. I submit that such considerations were only speculated upon by the I C C in the instant deliberations on the ten year period. A fact finding on the proper divestiture period in this case may well yield a different period of time. See United States v. Aluminum Company of America, 247 F.Supp. 308 (E.D.Mo.1965), wherein one year was determined to be a sufficient period. In Baltimore & Ohio Railroad Co. et al. v. United States et al., 386 U.S. 372, 87 S.Ct. 1100, 18 L. Ed.2d 159 (1967), the order of the I C C fell when protective conditions were withdrawn while the factual determinations upon which they were based remained. I believe that an order must fall when the converse is true, i. e. when protective conditions are included without a factual basis for their provisions.
Therefore, I would set aside the I C C order and remand the merger proceedings for further action in accordance with the provisions of my opinion.
NOTES
[1] The basis of Kansas City Southern's objection to the merger order was the refusal of the ICC to condition the merger upon purchase and lease of certain trackage by KCS from Central Gulf.
[2] MoPac's suspicions of UP control do appear to have some historical foundation. In 1907, the ICC said, "It is undoubtedly a fact that Mr. Harriman [the Chairman of UP's Executive Committee] dominates the Illinois Central; and in view of the large block owned by the Union Pacific it is quite likely this power can be continued." Consolidation and Combination of Carriers, 12 I.C.C. 277, 294 (1907). Then, in 1951, this subject was broached by Judge Jerome Frank of the Second Circuit, who former S.E.C. Commissioner (now Mr. Justice) Douglas has said "had no superior when it came to an understanding of the ways of high finance. . . ." Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 178, 77 S.Ct. 763, 778, 1 L.Ed.2d 726 (1957). Judge Frank said, "The Union Pacific Railroad holds about 25% of the outstanding common stock [of Central] . . . and was therefore pretty obviously in control of the Board of Directors." Guttman v. Illinois Cent. R.R. Co., 189 F.2d 927, 928 n. 2 (2d Cir. 1951), cert. denied, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951).

Of course, UP's holdings have since diminished from 25% to 10.4%, but such arithmetical reductions alone do not preclude the retention of subtle, controlling influence. Cf. North American Co. v. S.E.C., 327 U.S. 686, 693, 66 S.Ct. 785, 790, 90 L.Ed. 945 (1946) where the Court said,
"Historical ties and associations, combined with strategic holdings of stock, can on occasion serve as a potent substitute for the more obvious modes of control. Domination may spring as readily from subtle or unexercised power as from arbitrary imposition of command. To conclude otherwise is to ignore the realities of intercorporate relationships." (Citations omitted.)
[3] Chicago & N.W. Ry. Co.Control Chicago, Rock Island and Pac. R.R. Co., et al., F.D. No. 22688.
[4] The intricacies of the allegations of UP control are summarized in the Commission's report at 338 I.C.C. 805, 866-71.
[5] Norfolk & W. Ry. Co. and New York, C. & St.L. R.R. Co.Merger, 324 I.C.C. 1 (1964).
[6] The three were: (1) Bonhomie and Hattiesburg Southern R.R. Co.; (2) Fernwood, Columbia and Gulf Ry. Co.; and (3) the Columbus and Greenville Ry. Co.
[7] The ICC explained the reasoning for allowing ten years to divest as follows:

"The reason for a disposition period of this length is to avoid a serious mal-adjustment in the value of the securities, which could result from a `forced dumping' of the stock in a short period; and to preclude adverse effects upon existing security holders and upon the stability of the carriers involved. The Commission has no wish to create artificial or distress conditions in the securities market, or, by our decision herein, to jeopardize the situation of the carriers or cause a detrimental impact on the widely dispersed stockholders owning the remaining 84 percent or more of Industries stock, other than UP. In turn, it is possible that the delicately balanced stock exchange ratios worked out for the purposes of this transaction would also be thrown out of phase, with one applicant taking a windfall advantage at the expense of the other."
338 I.C.C. at 869.
[8] Before the Commission, MoPac contended its losses by diversion to a UP-controlled Central Gulf would be "27 percent of our average 1964 to 1968 pre-tax net income. . . ." Transcript at 9918. In this court it is said to be "40% of its average annual post-tax net income for the five year period 1966-70." Plaintiff's brief, Vol. 1, at 3.
[9] The ICC in brief contended that its power to govern its own procedure immunized it from MoPac's contention that it should complete the control investigation before approving the merger. However, we cannot agree that an agency's control over its docket extends to omitting a finding essential to its statutory duty. Thus, if the investigation were the only method of making an essential finding, the Commission's procedural prerogatives would yield.
[10] The Commission and intervenors have stressed in brief that the relief MoPac now seeks, to wit completion of the control investigation and complete divestiture before consummation of the merger, was not requested before the ICC and they thus argue that MoPac is estopped from claiming error on those points now. However, we do not think the decision of an agency charged with protecting the public interest can be affirmed on the sole ground that a private litigant made procedural mistakes. In deciding whether a merger is in the public interest, the Commission is "`not expected merely to call balls and strikes, or to weigh the evidence submitted by the parties and let the scales tip as they will. . . . As the sole representative of the public, which is a third party in these proceedings, the agency owes the duty to investigate all the pertinent facts, and to see that they are adduced when the parties have not put them in. . . .'" Isbrandtsen Co. v. United States, 96 F. Supp. 883, 892 (S.D.N.Y.1951), aff'd by equally divided court, sub nom, A/S. J. Ludwig Mowinckels Rederi v. Isbrandtsen Co., Inc., 342 U.S. 950, 72 S.Ct. 623, 96 L.Ed. 706 (1952), quoting Hearings on S. 674, 675 and 918 Before a Senate Subcommittee, April 29, 1941, pp. 465-66.
[11] We are also persuaded by the Commission's assertion in brief and oral argument that it would be against UP's interest to attempt to flout these voting trusts because such actions would jeopardize its own pending merger with the Rock Island Line.
[12] MoPac contends that because UP is not a named party to this merger proceeding the ICC has no jurisdiction over UP to enforce the divestiture condition. Indeed, MoPac has contended this alleged lack of jurisdiction vitiates this entire order. The latter contention is clearly incorrect, Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 171-172, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957), and we also have no doubt that since UP, as a carrier, is within the Commission's jurisdiction, the ICC can enforce against UP those conditions it has decided are necessary to the public interest. Indeed, UP is a named party in the § 5(4) proceeding and it was in that proceeding that UP agreed to the divestiture.
[13] We note, too, that during oral argument before the ICC on their exceptions to the Examiner's Report (argument preceded UP's decision to divest), MoPac and Chicago & North Western stressed the failure to conduct a control investigation and the alleged ability of UP to flout the voting trusts. They objected to a Norfolk and Western type divestiture, i. e., ten years, only on the grounds that the ICC had no jurisdiction over UP to impose divestiture in this case. But see, note 12, supra. Indeed, counsel for MoPac in the present case told the ICC:

". . . if Your Honors decide you have power in this proceeding to direct Union Pacific to divest itself of its stock, if it finds Union Pacific is in a position to exercise control over Gulf as you did with the Pennsylvania stock in the Norfolk and Western-Nickel Plate Case, our purpose would be served."
Transcript at 9921 (emphasis supplied).
Of course, such a representation does not estop MoPac from claiming as error now what it previously said was its objective, see note 10, supra; but it is illuminating to follow MoPac's amorphous position, especially in light of its own allegation that ICC proceedings lend themselves to tactics of delay if employed in a virtuoso performance.