782 F.2d 263
 251 U.S.App.D.C. 181
 GTE SERVICE CORPORATION, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
MCI Telecommunications Corp., Illinois Bell Telephone Co.,
et al., New York Telephone Co., et al., Pacific Bell, et
al., Southwestern Bell Telephone Co., Bell Telephone Company
of Pa., et al., American Telephone and Telegraph Company,
North American Telecommunications Association, US West,
Inc., Intervenors.
 No. 84-1451.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 24, 1985.
Decided Jan. 28, 1986.
 
 Appeal from an Order of the Federal Communications Commission.
 William Malone, with whom James R. Hobson was on brief for appellants, GTE Service Corp., et al.
 John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, C. Grey Pash, Jr. and Jane E. Mago, Counsel, F.C.C., were on brief for appellee, F.C.C. Bruce E. Fein, F.C.C., also entered an appearance for appellee.
 Robert B. McKenna, with whom Jeffrey S. Bork, Robert W. Barker, and L. Andrew Tollin were on brief for intervenor, US West, Inc. Luisa L. Lancetti also entered an appearance for US West, Inc.
 Alfred Winchell Whittaker, with whom Thomas J. Reiman was on brief for intervenor, American Information Technologies Corp.
 Jules M. Perlberg, with whom Jonathan S. Hoak, Howard J. Trienens and Alfred A. Green were on brief for intervenor, American Tel. and Tel. Co.
 Michael H. Bader, Kenneth A. Cox, William J. Byrnes, Thomas R. Gibbon and Theodore D. Kramer were on brief for intervenor, MCI Telecommunications Corp. Robert Michelson also entered an appearance for intervenor MCI Telecommunications Corp.
 Robert L. Barada and Dennis S. Kahane were on brief for intervenors, Pacific Bell, et al. Nancy L. Knowlton and Stanley J. Moore also entered appearances for intervenors Pacific Bell, et al.
 Edgar Mayfield, William C. Sullivan, Linda S. Legg and Liam S. Coonan were on brief for intervenor, Southwestern Bell Telephone Co.
 Saul Fisher, John B. Messenger, Raymond F. Scully and Alan B. Sternstein were on brief for intervenors, New York Telephone Co., et al.
 Lawrence W. Katz entered an appearance for intervenors, Bell Telephone Co. of Pennsylvania, et al.
 Albert H. Kramer and Denise Boon entered appearances for intervenor, North American Telecommunications Assn.
 Before MIKVA and STARR, Circuit Judges, and GREENE, District Judge.*
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 GTE Service Corp. owns several "independent" local telephone companies, that is, local companies that were not part of the AT & T family prior to the recent divestiture. The principal issue raised by GTE's appeal is whether the Federal Communications Commission abused its discretion when it authorized the transfer of facilities necessary to implement the break-up of the Bell System, while reserving for later rate proceedings questions about the accounting treatment of certain divestiture expenses. GTE contends that, inasmuch as its rights under various contracts with AT & T are tied to the accounting treatment of these items, GTE has been improperly required to pay a portion of AT & T's divestiture-related costs.
 
 
 2
 For the reasons that follow, we conclude that the Commission did not abuse its discretion. Accordingly, we affirm.
 
 
 3
 * An understanding of this dispute requires a passing familiarity with the consent decree under which AT & T has divested its local telephone operations and a more detailed recounting of the history of the FCC proceedings now under review.
 
 
 4
 As is by now well known, the transformation of the Nation's telephone system began on November 20, 1974, when the Department of Justice filed suit in the United States District Court for the District of Columbia against AT & T, Western Electric, and Bell Laboratories, alleging various violations of the antitrust laws. The Government charged, among other things, that AT & T, in violation of the Sherman Act, had monopolized the inter-city telecommunications market and the telecommunications product market by utilizing its control over the local Bell Operating Companies (BOCs) to preclude competition in both these markets. The remedy sought was the divestiture from AT & T of both the BOCs and Western Electric, AT & T's equipment manufacturing arm. Almost eight years later, in January 1982, the parties to that landmark litigation announced agreement on a proposed consent decree. The proposed decree was styled as a "Modification of Final Judgment" (MFJ) of a 1956 decree that had terminated an earlier antitrust action against AT & T. Pursuant to the Tunney Act, 15 U.S.C. Sec. 16(b)-(h) (1982), the District Court requested and received numerous public comments, including those of the FCC in which the Commission advanced the position that the MFJ should be approved because "it is reasonable and is likely to enhance competition in several different markets." Brief for Amicus Federal Communications Commission at 6-7, United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982).
 
 
 5
 The settlement was approved and the MFJ entered by the District Court on August 11, 1982. United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.). The District Court concluded that "the divestiture from AT & T of companies providing local services is in the public interest." Id. at 170. The court's judgment was thereafter affirmed by the Supreme Court. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).
 
 
 6
 With AT & T's fate thus determined, the MFJ required AT & T to divest itself of the BOCs within eighteen months, that is, by February 1984. See 552 F.Supp. at 226. Under the reorganization plan submitted by AT & T in December 1982 and approved, with modifications, by the District Court in April 1983, the BOCs were to be transferred to seven regional holding companies. See United States v. Western Elec. Co., 569 F.Supp. 1057, 1131 (D.D.C.), aff'd sub nom. California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).
 
 
 7
 Before effectuating this complex set of transactions, however, AT & T was required by sections 214 and 310(d) of the Communications Act, 47 U.S.C. Secs. 214, 310(d) (1982), to obtain formal Commission approval of the transfer of licenses and facilities. On January 14, 1983, the FCC ordered AT & T to file the required applications no later than March 1, 1983. AT & T complied. The FCC then placed the applications on public notice pursuant to section 309(b) of the Act, 47 U.S.C. Sec. 309(b). Thereafter, GTE filed a petition to deny. GTE asserted that, inasmuch as divestiture primarily benefitted AT & T's shareholders, the Commission's consent should be conditioned so that the shareholders--and not the public or other carriers--would bear the expenses of divestiture.
 
 
 8
 GTE's interest in AT & T's divestiture expenses arises from inter-carrier contractual relations governing domestic toll telephone services. Prior to divestiture, these services were provided jointly by AT & T, the BOCs, and some 1400 independent telephone companies, a number of which are owned by GTE.[1] Under the "settlements" contracts between the BOCs and the larger independent companies, all revenues from jointly provided services were first placed in a common pool.[2] The total expenses of the participating carriers attributable to the joint services were then paid out of the pool, with the balance distributed among the participating carriers in proportion to their investments used in providing the joint services. The net effect of all this was, in GTE's words, that "each carrier recovered its expenses and earned a uniform rate of return on its investment in the joint enterprise." GTE Brief at 12. Because of these settlement arrangements, expenses of one carrier improperly charged against the joint service diminished the common rate of return, thereby reducing the total amount paid to the other carriers.[3]
 
 
 9
 GTE contended before the FCC, and contends here, that AT & T has been improperly charging divestiture-related expenses--particularly $393 million in litigation costs--against the settlements pool since 1974. GTE sought to have the FCC disallow these expenses for both ratemaking and settlements purposes, and to require AT & T, as a condition of Commission approval at AT & T's divestiture-related transfers, to make the appropriate accounting adjustments. In GTE's view, this remedial action would reverse what GTE deems to be improper expense charges against the settlements pool and would thereby result in reimbursement to the independent carriers under the so-called "true-up" (retroactive adjustment) provisions of the settlements contracts.
 
 
 10
 On December 23, 1983, the Commission released its Transfer Order granting AT & T's application and authorizing the necessary transfers. 96 F.C.C.2d 18 (1983). This order contained twelve conditions, including four (conditions 4 through 7) specifying the accounting treatment to be given AT & T's divestiture-related expenses.[4] In a separate statement, FCC Chairman Fowler objected to the latter conditions on the grounds that they were not needed to ensure that divestiture was in the public interest and that they amounted, in practical effect, to a disallowance of the covered expenses. Id. at 111. Chairman Fowler also opined that such a disallowance "ordinarily involves full hearing rights." Id.
 
 
 11
 AT & T and several Bell companies filed petitions for reconsideration, objecting to the four transfer conditions for largely the reasons articulated by the Chairman. GTE filed a petition seeking "clarifications" from the Commission on two points. GTE sought an explicit determination that administrative costs of divestiture were to be disallowed for settlements as well as ratemaking purposes. It also sought a determination that AT & T's litigation costs, not explicitly addressed in the Transfer Order, were indeed included in the administrative costs disallowed by the order. AT & T's own estimate of the administrative costs of divestiture--$111 million--did not include litigation expenses incurred prior to divestiture.
 
 
 12
 On July 30, 1984, the Commission released a second order. 96 F.C.C.2d 141. In this Reconsideration Order, the Commission not only refused to make the "clarifications" sought by GTE, but deleted the four controverted conditions set forth in the Transfer Order. The stated reason for this agency about-face was that consideration of AT & T's divestiture-related costs should be deferred until later ratemaking proceedings. The Commission explained that a tariff proceeding would permit more focused attention on what costs were sought to be recovered, from whom, for which services, and over what time frame. Id. at 150-51.
 
 
 13
 GTE's appeal followed. GTE appears to challenge the FCC's Reconsideration Order under two distinct provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 551 et seq. (1982). GTE first contends that the FCC's ultimate determination, that transfer without the four contested conditions was in the public interest, convenience and necessity, should be overturned as arbitrary, capricious, and an abuse of discretion. See 5 U.S.C. Sec. 706(2)(A). Alternatively, GTE argues, the FCC's refusal to rule on the allowability of AT & T's divestiture-related costs constitutes an "unreasonable delay" of agency action within the meaning of 5 U.S.C. Sec. 706(1).
 
 II
 
 14
 It is axiomatic that under the Communications Act the Commission may approve a license transfer only if it finds that "the public interest, convenience and necessity will be served thereby." 47 U.S.C. Sec. 310(b). Section 214(c) of the Act confers authority upon the Commission to attach conditions to such a transfer. Clearly, then, the Commission may impose conditions whenever in the absence of such conditions the transfer would not be in the public interest.[5] Indeed, in such circumstances unconditional approval would presumably be arbitrary and capricious and could therefore be set aside under the APA.
 
 
 15
 But because the scope of judicial review over such agency determinations is narrow, GTE bears a substantial burden in showing that a grant without the four conditions was arbitrary and capricious. It cannot be gainsaid that this court is required to give substantial deference to decisions of the FCC, particularly where, as here, the Commission has determined that a particular course is or is not in the public interest. See FCC v. WNCN Listeners Guild, 450 U.S. 582, 593-94, 596, 101 S.Ct. 1266, 1273-74, 75, 67 L.Ed.2d 521 (1981). The public-interest standard is, after all, "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). Accordingly, we in the judiciary are not to substitute our own judgment for that of the agency. See FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 803, 98 S.Ct. 2096, 2116, 56 L.Ed.2d 697 (1978) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Our function is limited to determining whether the FCC's action resulted from consideration of the relevant factors and whether the agency has succumbed to a clear error of judgment. MCI Telecommunications Corp. v. FCC, 750 F.2d 135, 140 (D.C.Cir.1984).
 
 
 16
 GTE points to two indicia of caprice which, it contends, are sufficient to invalidate the FCC's ultimate determination that an unconditional transfer is in the public interest: (1) the Commission's alleged failure adequately to explain its abandonment of the four conditions imposed by the original Transfer Orders, see GTE Brief at 29-36; and (2) the alleged absence of evidence sufficient to support a finding that an unconditional transfer (i.e., a transfer absent the four contested conditions) is in the public interest, see id. at 36-40. We address each of these in turn.
 
 
 17
 * An agency must, of course, supply a reasoned explanation whenever it modifies or repeals an earlier conclusion. See, e.g., Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970). And the new course of action must itself be rationally grounded in the evidence before the agency. See NAACP v. FCC, 682 F.2d 993, 998 (D.C.Cir.1982). GTE appears to question the Commission's explanation on three distinct grounds. It first argues that the pivotal fact on which the Commission relied in changing its mind--that none of the divestiture-related administrative costs identified in the Commission's Transfer Order had yet been included in existing rates--was unsupported and, indeed, contradicted by the existence of AT & T litigation expenses going back to 1974, some of which had been passed on to ratepayers. GTE's second argument is that the Commission failed to address the effect of its decision on intrastate rates. Finally, and most importantly from GTE's perspective, GTE contends that the Commission failed adequately to address the effect of its decision on the division of revenues between AT & T and independent local telephone companies.
 
 Litigation Expenses
 
 18
 As GTE rightly observes, the Commission's deletion of the four conditions was based in the main on AT & T's representation that none of the administrative costs identified in the Commission's Transfer Order had been included in any revenue requirement computations employed to support existing interstate rates. See 98 F.C.C.2d at 151 n. 35. In the FCC's view, this representation, combined with the required submission of detailed, quarterly reports identifying divestiture-related costs, permitted the Commission reasonably to conclude that these costs could more appropriately be analyzed in subsequent rate proceedings. We harbor no doubt that the Commission, the body responsible for reviewing interstate rate tariffs, is better situated to evaluate AT & T's representation about costs that had or had not been included in existing rates. Absent evidence casting doubt on that representation, we are reluctant to second-guess the Commission's evaluation in this respect.
 
 
 19
 GTE's sole factual assault against AT & T's representation is that AT & T had included litigation costs, which GTE views as administrative costs of divestiture, in the revenue requirements supporting past and existing rates. See GTE Brief at 31-32. We are persuaded, however, that GTE's argument is based on a misunderstanding of "administrative costs" as used in the Commission's Transfer Order. That term, we are satisfied, included only certain categories of costs--such as filing of registration statements, logo changes, and legal expenses related to the organization of the new regional holding companies--which AT & T estimated at $111 million. See 96 F.C.C.2d at 70-72 & n. 162. That term did not include the $393 million in pre-settlement litigation costs identified by GTE. When GTE, moreover, sought to have the Commission "clarify" its definition so as to include litigation expenses, a request GTE had previously made in its Petition to Deny, see J.A. at 124-27, the Commission refused, see 98 F.C.C.2d at 151-52 n. 37. The FCC observed, rather, that the proper treatment of these costs had already been determined in its Litigation Expenses decision, 92 F.C.C.2d 140 (1982), which squarely held that such expenses were to be handled through ratemaking proceedings.
 
 
 20
 More fundamentally, GTE's argument that pre-MFJ litigation expenses should be considered administrative costs of divestiture has little conceptual appeal. These expenses were incurred prior to divestiture, were clearly not part of the costs of implementing divestiture, and would have been incurred whether or not divestiture occurred. Accordingly, it would have been odd for the Commission to consider such pre-divestiture costs in analyzing whether divestiture itself was in the public interest.
 
 
 21
 Since the Commission did not include litigation expenses in its definition of administrative costs, the Commission's Transfer Order did not have any effect on the accounting classification of such expenses for ratemaking or any other purposes. Its Reconsideration Order merely restated the Commission's settled position on litigation expenses. Because the agency's position remained the same in both orders, there was simply no change of mind in this respect requiring an explanation.
 
 Intrastate Rates
 
 22
 GTE's argument about the Commission's treatment of intrastate ratepayers fails for similar reasons. The conditions included in the Transfer Order, it will be recalled, had required AT & T to "notify the appropriate state commissions that this Commission had determined that these costs shall not be included in intrastate rates" 96 F.C.C.2d at 91-92; see supra note 4. The Commission, however, subsequently ruled in its Reconsideration Order that it would not make a determination regarding its ratemaking treatment of divestiture-related costs at that particular time. Retention of the requirement that the state commissions be provided with information regarding the FCC's treatment of those costs for interstate ratemaking purposes would therefore have been nonsensical. Given the agency's shift, there was simply nothing about which to notify the state commissions.
 
 
 23
 The FCC, in any event, has no direct control over intrastate ratemaking. Its Transfer Order observed that "[i]t is ... not possible to predict the actions of the state regulatory bodies, which can have a tremendous effect upon the rates ultimately paid by end users." 96 F.C.C.2d at 69. The cited provisions of the original reporting conditions were at most designed to "flag" divestiture-related costs for the state commissions, presumably so that those regulatory bodies could more readily prevent such costs from being passed on to ratepayers in the form of higher rates for local service and intrastate toll calling. But in view of the FCC's abandonment of its earlier conclusion that AT & T shareholders alone should bear the costs of divestiture, see 98 F.C.C.2d at 151-52 n. 37, no immediate need existed to identify these costs for the benefit of the various state commissions. The Commission's failure to take explicit amount of the effect on intrastate ratepayers wrought by rescinding the four conditions was therefore neither arbitrary nor capricious.
 
 Division of Revenue
 
 24
 GTE next contends that the Commission failed adequately to explain its retreat from the view, which GTE contends was embodied in condition 4, see supra note 4, that divestiture costs should not only be disallowed for ratemaking purposes, but for purposes of inter-carrier settlements or division of revenue as well. GTE points to the first clause of condition 4, which stated, "[E]ach company shall identify any divestiture-related administrative costs that have been charged to operations in the division of revenue process and reclassify these costs to Account 323, Miscellaneous income charges." 96 F.C.C.2d at 91 (emphasis added). From this, GTE infers that the Commission intended to disallow these costs for division-of-revenue purposes; accordingly, the Commission was obligated to explain, in its Reconsideration Order, why it no longer thought such disallowance appropriate. See GTE Brief at 32.
 
 
 25
 We disagree with the premise of GTE's argument. The phrase on which GTE relies, we are convinced, was not intended as a disallowance of divestiture-related costs for division-of-revenue purposes. Rather, since revenues and costs are typically apportioned through the settlements process well before they are scrutinized in the FCC ratemaking process, the phrase on which GTE relies merely served, it seems to us, to identify the particular costs that the FCC intended to disallow for ratemaking purposes.[6]
 
 
 26
 This conclusion is supported by the fact that the Commission's Transfer Order nowhere stated that condition 4 was intended to disallow any costs in the division-of-revenue process. Although one might infer such an intention from the Commission's statement that AT & T shareholders should bear the costs of divestiture (because any costs borne by independent carriers as a result of the division-of-revenue process might ultimately be passed on to those carriers' customers), that inference is certainly not compelled by the Transfer Order. Moreover, because interference in division of revenues is not the sort of action the Commission takes lightly,[7] we are of the view that the Commission would have addressed this issue explicitly if it had, in fact, intended to disallow these expenses for settlements purposes as well as ratemaking purposes. The settlements contracts are, after all, private agreements among the carriers; indeed, such agreements are not even required to be filed with the Commission in the first instance, see C.F.R. Sec. 43.51(e) (1984). Carriers may, if they choose, agree that FCC classification will always determine which costs are allowed, but they need not do so.[8] And, as GTE itself observed before the Commission, some items that are disallowed for ratemaking purposes are routinely allowed for settlements purposes. J.A. at 388.
 
 
 27
 Without a clear statement to this effect, therefore, we are most reluctant to conclude that the Commission intended to affect directly the private contractual relationships among AT & T and the independent carriers. Thus, even accepting GTE's representation that by virtue of the manner in which some of its settlements contracts are drafted, mere reclassification of expenses by the FCC would facilitate GTE's recovery of those expenses from AT & T, we conclude that any benefit GTE might have received from this reclassification was entirely coincidental. Accordingly, the Commission was not required to address specifically whatever effects deletion of condition 4 might have had on the division-of-revenue process.
 
 
 28
 From this discussion, it is clear that the conditions deleted by the Commission's Reconsideration Order were intended only to disallow the administrative costs of divestiture (estimated at $111 million) for purposes of interstate ratemaking. It appears that they were in no wise intended to have any effect on the treatment of AT & T's litigation expenses or on the division-of-revenue process, and were not designed to have any direct effect on intrastate ratemaking. Viewed in that light, we conclude that the Commission's explanation for deleting the four conditions--that divestiture costs could more fruitfully be addressed in later ratemaking proceedings--was entirely adequate.
 
 B
 
 29
 GTE next argues that, even if the Commission adequately explained its deletion of the four reporting conditions, the Commission nonetheless acted arbitrarily because its ultimate public interest finding, i.e., that the requested transfers were in the public interest, convenience and necessity even without those conditions, lacks sufficient support in the record. Here again, the scope of our review is narrow. We must uphold findings of fact that are not the result of a clear error of judgment and that have a "rational basis" in the record. See Ethyl Corp. v. EPA, 541 F.2d 1, 34-35 n. 74 (D.C.Cir.) (en banc), cert. denied sub nom. E.I. Du Pont de Nemours & Co. v. EPA, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).[9]
 
 
 30
 GTE questions the factual basis of the FCC's public-interest determination on two grounds. GTE first argues that the Reconsideration Order left "undisturbed" a crucial "finding" in the Transfer Order, namely that only AT & T shareholders and not ratepayers would benefit from the administrative costs of divestiture. See 96 F.C.C.2d at 71. According to GTE, this finding compelled the conclusion that the transfer would be in the public interest only if conditioned upon AT & T shareholders' bearing all divestiture-related costs. GTE Brief at 28-29.
 
 
 31
 This argument, however, is based on a misreading of both orders. As a preliminary matter, the Commission stated only that certain administrative costs of divestiture "do not appear to provide direct benefits to the ratepayers." 96 F.C.C.2d at 71 (emphasis added). Moreover, the Reconsideration Order retracted, at least implicitly, the earlier conclusion. There, the Commission stated that deferring consideration of these costs to ratemaking proceedings would allow a more thorough analysis of "the benefits and detriments of allowing or disallowing particular costs" and of "the question whether they should be included in revenue requirements," that is, passed on to ratepayers. 98 F.C.C.2d at 150-151. The Commission then concluded, "we are now making no determination as to who should bear the divestiture related costs." Id. at 152 n. 37. Finally, and perhaps most important, the conclusion of the Transfer Order that divestiture would serve the public interest was never predicated on AT & T's bearing the full costs of divestiture. That order stated that "[e]ven if most of the identified [divestiture] costs properly are borne by ratepayers, ... [o]n balance, we find that the probable costs and potential effects on ratepayers, do not outweigh the long-term benefits of divestiture." 96 F.C.C.2d at 69.
 
 
 32
 GTE also attacks the FCC's unconditional transfer approval on the ground that the FCC could not rationally approve such a transfer without knowledge of the total costs of divestiture, a fact which the FCC "admitted" it did not know. See GTE Brief at 36-40. The Commission expressly acknowledged that it lacked "sufficient information to make an accurate estimate of the total costs of divestiture" at the time it issued the Transfer Order, 96 F.C.C.2d at 68; apparently, the Commission had garnered no additional relevant information on the magnitude of these costs when it issued its Reconsideration Order. However, the Commission determined that, notwithstanding this lack of information, it could appropriately authorize the transfers because reporting conditions could be imposed that would enable the Commission to monitor and act upon relevant costs as they became known. See 98 F.C.C.2d at 150-51.
 
 
 33
 The Commission, moreover, did have before it fairly precise estimates of most of the costs; the FCC concluded that, "in light of the figures that we do have (and considering the probable magnitude of the costs that apparently cannot be predicted with certainty)," the benefits of divestiture outweighed the costs. 96 F.C.C.2d at 69. GTE cites no authority for the rather remarkable proposition in a complex regulatory world that the FCC cannot grant unconditional transfers without complete data on all relevant factors. Even under the authorities cited by GTE,[10] the FCC was required only to consider the relevant factors, not quantify them with rigorous exactitude.
 
 
 34
 In sum, we are unable to discern in the FCC's action either a clear error of judgment or a failure to consider the relevant factors. We hold, moreover, that ample evidence in the record supported the Commission's ultimate conclusion that a transfer without the four conditions satisfied the public-interest standard. The Commission found that divestiture would likely produce a number of potential consumer benefits, including generally lower prices, increased technological advances, and an industry structure more sensitive to consumer desires. See 96 F.C.C.2d 47-48, 50-51, 58-61. Each of these findings was amply supported by the evidence, see id.; taken together, they comfortably provide the requisite support for the Commission's decision.[11]
 
 III
 
 35
 GTE also argues that, even if the FCC properly found the transfer sans conditions to be in the public interest, this court should reverse the agency's decision to defer consideration of the disputed expenses on the ground that this postponement occasioned an "unreasonable delay" of agency action within the meaning of the APA, 5 U.S.C. Sec. 706(1). See GTE Brief at 40-48. GTE contends in essence that the FCC could consider the disputed expenses more efficiently in conjunction with the transfer proceeding than in a separate rate proceeding, see GTE Brief at 41-42, and that the FCC's decision is prejudicial to GTE "because under the circumstances here deferral was equivalent to a refusal ever to rule on disallowance of the past expenses," GTE Reply Brief at 31.
 
 
 36
 We cannot agree. First, it is not ours to say whether one procedure for dealing with a particular issue at the administrative level is more or less efficient than another. "[T]his court has upheld in the strongest terms the discretion of regulatory agencies to control the disposition of their caseload." Nader v. FCC, 520 F.2d 182, 195 (D.C.Cir.1975) (citations omitted). The FCC enjoys express statutory authority to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. Sec. 154(j) (1982); see Cellular Mobile Systems of Penn., Inc. v. FCC, 782 F.2d 182, at 197 (D.C.Cir.1985).[12] Absent some unreasonable delay or significant prejudice to the parties, the Commission cannot be said to abuse its discretion merely by adopting procedures and timetables which it considers necessary to effective treatment of complex and difficult problems. Associated Press v. FCC, 448 F.2d 1095, 1106 (D.C.Cir.1971).[13]
 
 
 37
 Second, the Commission's postponement does not, we are convinced, impose any significant hardship on GTE. Despite repeated jeremiads to this effect, see, e.g., GTE Reply Brief at 6, GTE has failed to demonstrate that the promised ratemaking consideration of the disputed expenses will never occur. More important, GTE admitted during oral argument that it has at least two additional remedies against AT & T--a civil suit under its settlement contracts or a complaint under the Communications Act, 47 U.S.C. Sec. 207, filed with the FCC. See Transcript of Oral Argument at 21. Either of these proceedings, if successful, would presumably entail an examination of the challenged expenses by the FCC. (In the former instance, the FCC could review the matter via a "primary jurisdiction" referral, if the action were brought in federal court.) Thus, this case is clearly not, as GTE colorfully puts it, " 'the last train' leaving 1919 M Street." GTE Reply Brief at 3.
 
 IV
 
 38
 For the reasons stated, we are unable to conclude that the Commission acted arbitrarily or capriciously in issuing its Reconsideration Order, either because it failed adequately to explain its deletion of the four reporting conditions, or because its ultimate public interest finding was inadequately supported. We also cannot agree that the Commission's postponing consideration of AT & T's divestiture-related expenses constituted an "unreasonable delay." The Commission's decision is therefore
 
 
 39
 Affirmed.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 See generally MTS & WATS Market Structure, 55 Rad.Reg.2d (P & F) 785 (1984), aff'd in part, NARUC v. FCC, 737 F.2d 1095, 1108 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985); Amendment of Part 67, 89 F.C.C.2d 1, 7 n. 15, 14, 17 (1982), aff'd sub nom. MCI Telecommunications Corp. v. FCC, 750 F.2d 135 (D.C.Cir.1984)
 
 
 [2]
 See United States v. AT & T, No. 82-0192 (D.D.C.) (Memorandum Order filed December 1, 1983); Access and Divestiture Related Tariffs (Contract Extension), 55 Rad.Reg.2d (P & F) 1080, 1094-98 (1984)
 
 
 [3]
 GTE provides the following helpful example of this phenomenon:
 Assume a joint enterprise in which Carrier A has an investment of $800 and Carriers B and C each have investments of $100, for a total of $1,000. Further assume gross revenues of $100 and aggregate expenses of $50. The common rate of return is 5%, and the carriers receive returns on investment (or profit) of $40, $5, and $5, respectively. Now assume that Carrier A improperly charges $10 of additional expense. That $10 is paid to Carrier A out of the revenue pool, dollar-for-dollar. Aggregate expenses rise to $60; the common rate of return falls to 4%; and the carriers receive returns of $32, $4, and $4. Thus, the improper charge by A has increased payments to A by $2 and decreased payments to B and C, $1 apiece.
 GTE Brief at 12-13.
 
 
 [4]
 The four conditions were as follows:
 (4) Within 30 days of the date of divestiture, each company shall identify any divestiture-related administrative costs that have been charged to operations in the division of revenues process and reclassify these costs to Account 323, Miscellaneous income charges. Each company shall notify the appropriate commissions of the amounts identified. At the same time, the companies shall notify the appropriate state commissions that this Commission has determined that the recovery of these costs shall not be included in interstate rates. Any amount already included in interstate rates shall be used to reduce the revenue requirement in the next proposal to revise current interstate rates, including proposals already on file, but not yet effective.
 (5) Within 30 days of the date of divestiture, each company shall identify and remove any divestiture-related administrative costs currently included in the revenue requirement in any pending interstate tariff filing and reclassify these costs to Account 323. Each company shall identify any such costs currently included in any pending interstate tariff filing and shall notify the appropriate state commissions that this Commission has determined that these costs shall not be included in interstate rates.
 (6) Within 30 days of the date of divestiture each company shall reclassify any divestiture-related administrative costs incurred in 1983 not currently included in the revenue requirement in a pending tariff filing or charged to operations in the division of revenue process to Account 323. Each company also shall notify the appropriate state commissions that this Commission has determined that these costs shall not be included in interstate rates. Each company shall include any divestiture-related administrative costs incurred in the future in Account 323. The carriers may seek, however to justify the inclusion of certain costs in interstate rates by presenting evidence that demonstrates that the costs it purposes to include directly benefit ratepayers. Public comment will be sought.
 (7) Each company shall include the investment and expenses that have been incurred as well as future investment and expenses incurred in reconfiguring the network, (including those reconfiguration costs incurred as a direct result of termination of the sharing arrangements) in Account 103, Miscellaneous physical property or Account 323, respectively. The carriers may seek, however, to justify the inclusion of these costs in interstate rates by presenting evidence within 60 days of the date of divestiture that demonstrates that the costs it purposes to include are not duplicative and directly benefit ratepayers. Public comment will be sought.
 
 
 [96]
 F.C.C.2d at 91-92
 
 
 [5]
 As one of the intervenors' briefs points out, section 214(c) provides that the FCC "may" impose such conditions as "in its judgment" are appropriate. 47 U.S.C. Sec. 214(c); see Joint Brief of the Ameritech Operating Companies and the Bell Atlantic Operating Companies (Ameritech/Bell Atlantic Brief) at 22. Contrary to the conclusion sought to be drawn by these intervenors, however, this language does not render the FCC decision at issue here unreviewable on the ground that it is a decision "committed to agency discretion by law" under section 701(a)(2) of the APA. As already noted, section 310(d) of the Communications Act requires a finding that the transfer, as modified by any conditions attached by the Commission, be in the public interest. A determination on this issue is clearly reviewable. The portion of section 214(c) cited by the intervenors does, however, confer upon the Commission wide latitude in choosing among conditions or sets of conditions that would be sufficient by themselves to bring the transfer within the public-interest standard
 
 
 [6]
 Specifically, the phrase conveniently identified all such costs that had either been included in revenue requirements supporting existing tariffs (condition 4) or pending tariffs (condition 5) as well as similar costs, already incurred, that might be included in revenue requirements in future rate-making proceedings (condition 6). As we read these conditions, the phrase "charged to operations in the division of revenues process" was incorporated in conditions 5 and 6 by reference to the "divestiture-related administrative costs" identified in condition 4
 
 
 [7]
 See Tropical Radio Tel. Co. v. Western Union Tel. Co., 17 F.C.C. 645, 649-50 (1953) (holding that section 222 of the Communications Act did not permit the Commission to prescribe retroactive division of revenues) (citing Brimstone R.R. & Canal Co. v. United States, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928))
 
 
 [8]
 See, e.g., NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, SEPARATIONS AND SETTLEMENTS IN THE TELEPHONE INDUSTRY 32-35 (1979)
 
 
 [9]
 GTE also argues that the substantial-evidence test applies to the Commission's findings of fact in this proceeding. See GTE Brief at 34 n. 29. We need not address this argument, in light of our recent decision concluding that no substantive difference exists between this test and the "rational basis" test. See Association of Data Processing Service Organizations, Inc. v. Board of Governors, 745 F.2d 677, 683-84 (D.C.Cir.1984)
 
 
 [10]
 See, e.g., Denver & R.G.W.R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967) (holding that FCC must consider control and anticompetitive consequences before approving transfer of stock under public interest standard unless there is reasonable justification for deferring consideration of issue)
 
 
 [11]
 In light of our conclusion that the Commission acted reasonably in concluding that an unconditional license transfer was in the public interest, we need not, and do not, address the nettlesome question whether the four conditions imposed by the Commission's Transfer Order would run afoul of the ratemaking provisions of the Communications Act, 47 U.S.C. Secs. 201-205. We also decline to address the validity of the "no retroactive ratemaking" principle urged upon us by some of the intervenors, or whether the Commission's original conditions would violate any such principle. See AT & T Brief at 29-35; Ameritech/Bell Atlantic Brief at 26-33; Joint Brief of Intervenors Pacific Bell and Nevada Bell at 5-8; Brief of Appellee-Intervenors New York Telephone Company and New England Telephone and Telegraph Company at 27-31. Finally, we need express no view on whether disallowance of the costs at issue here would constitute an unconstitutional taking of property, as urged by some intervenors. See id. at 13-14. Affirmance on any of these grounds would in any event run contrary to the venerable principle of SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), that an agency's decision must be upheld, if at all, on the rationale advanced by the agency
 
 
 [12]
 A number of cases, moreover, both of the Supreme Court and this court, have emphasized the inherent powers of an agency to control its own docket. See, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978) ("administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties' ") (quoting FCC v. Pottsville Broadcasting Co., supra ); Association of Businesses Advocating Tariff Equity v. Hanzlik, 779 F.2d 697, 702 (D.C.Cir.1985) ("[A]gencies are empowered to order their own proceedings and control their own dockets.") (footnote omitted); NRDC v. SEC, 606 F.2d 1031, 1056 (D.C.Cir.1979) ("An agency is allowed to be master of its own house, lest effective agency decisionmaking not occur in any proceeding ...") (emphasis in original)
 
 
 [13]
 Cf., e.g., Nader v. FCC, supra, 520 F.2d at 296-307 (ten-year delay unreasonable in light of substantial harm to consumers and specialized common carriers resulting from FCC's failure to address alleged subsidization by AT & T of competitive telephone services); MCI Telecommunications Corp. v. FCC, 627 F.2d 322, 324-25 (D.C.Cir.1980) (five-year delay in determining lawfulness of telephone rates held unreasonable where agency repeatedly acknowledged that rates were unsupported yet refused to resolve controversy). See also Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 79-80 (D.C.Cir.1984) (discussing factors to be considered in issuing mandamus to compel agency action unreasonably withheld)